# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY
## SOUTHERN DIVISION

BRIAN ADAMS AND ALICE ADAMS, HIS WIFE;                    PLAINTIFFS,
EDWARD ADAMS AND ANDREA ADAMS, HIS WIFE;
PHYLLIS ADAMS, EXECUTRIX OF THE ESTATE OF
RICK ADAMS; GREGORY ADDINGTON AND
STEPHANIE ADDINGTON, HIS WIFE;
SHEILA ADKINS (WIFE OF LARRY ADKINS,
PLAINTIFF IN PIKE CIRCUIT ACTION 20-CI-382);
EDWARD AKERS AND BRENDA AKERS, HIS WIFE;
GARY ANDERSON AND DINAH ANDERSON,
HIS WIFE; LUTHER ANDERSON AND KATHY
ANDERSON, HIS WIFE; DAVID ASHLEY AND VICKEY
ASHLEY, HIS WIFE; GARY BAKER; RODNEY BAKER
AND ALICE BAKER, HIS WIFE; TIM BALTHIS AND
FRANCIS BALTHIS, HIS WIFE; CHRIS BANKS;
ROBERT BANKS AND PEGGY BANKS, HIS WIFE;
BILLY BARTLEY AND RITA BARTLEY, HIS WIFE;
GARY BENNETT; NICKEY BENTLEY AND JACKLYN
BENTLEY, HIS WIFE; JAMES BENTLY AND TERESA LYNN
BENTLY, HIS WIFE; ROY BILITER AND ROBIN
BILITER, HIS WIFE; BRANDON BLACKBURN AND
JENNIFER BLACKBURN, HIS WIFE;
ROGER BLAIR AND PATRICIA BLAIR, HIS WIFE;
JOEY BOYD AND PATTY BOYD, HIS WIFE;
RAYMOND BRANHAM AND TRACEY BRANHAM,
HIS WIFE; RICHARD BRASHEAR AND TOMEKA
BRASHEAR, HIS WIFE; CHARLES BRYANT AND
CAROL BRYANT, HIS WIFE; ARTEMUS CAMPBELL
AND SANDRA CAMPBELL, HIS WIFE;
THOMAS CANTRELL AND CHEYENNE CANTRELL, HIS WIFE;
ELMER CASTLE AND STELLA CASTLE, HIS WIFE;
RANDY CAUDILL AND RETHO CAUDILL, HIS WIFE;
WILLIAM CHAFIN AND WANDA CHAFIN, HIS WIFE;
CLEO CHAPMAN; GARY CHAPMAN AND
MARGARET CHAPMAN, HIS WIFE;
RODNEY CHAPMAN AND TERESA CHAPMAN,
HIS WIFE; DAVID CHARLES;
BARRY COLEMAN AND PAULA MARIE COLEMAN,
HIS WIFE; ERVIN COLEMAN AND LOLA ANN COLEMAN,
HIS WIFE; BILLY COLLINS AND MARY COLLINS,
HIS WIFE; BRIAN COLLINS AND TONYA COLLINS, HIS WIFE;
GABRIEL CONN AND FAYE CONN, HIS WIFE;
JAMES CONN; VIRGIL CONN AND AMARINE CONN,

HIS WIFE; COLIN COOK AND JAMIE COOK,
HIS WIFE; ANTHONY CORNETT AND SHEILA
CORNETT, HIS WIFE; BRENDA PHILLIPS,
EXECUTRIX OF THE ESTATE OF WOODROW CRUM;
KEVIN DANIELS AND RITA DANIELS, HIS WIFE;
DONALD DAVIS AND TERESA DAVIS, HIS WIFE;
MICHAEL DINGUS; BRIAN DOTSON AND NIKKI
DOTSON, HIS WIFE; KEVIN DOTSON;
JAMES ESTEP AND VELVET ESTEP, HIS WIFE;
DIANE FIFE, EXECUTRIX OF THE ESTATE OF
ZACK FIFE; BRANDON FLEMING; JOSHUA FLEMING
AND REBECCA FLEMING, HIS WIFE;
BURNIS FOUTS; GOMER FOUTS AND SARA FOUTS,
HIS WIFE; RANDY FOUTS AND PATRICIA FOUTS,
HIS WIFE; JIMMY GIBSON AND HENRIETTA
GIBSON, HIS WIFE; CARLOS GILLEY AND
NORMA GILLEY, HIS WIFE; OLEN GOOD AND
CAROL GOOD, HIS WIFE; KEVIN GRIFFEY AND
CLARA GRIFFEY, HIS WIFE; DONNIE HALL AND
PATRICIA HALL, HIS WIFE; RONNIE HALL;
DOROTHY HALL, EXECUTRIX OF THE ESTATE
OF WAYNE HALL; JAMES HAMILTON AND
JEANENE HAMILTON, HIS WIFE; TOMMY HAMPTON
AND ELLEN HAMPTON, HIS WIFE; DAVID HARDIN
AND ANGELA HARDIN, HIS WIFE;
GREGORY HATFIELD AND DEBRA HATFIELD,
HIS WIFE; JOHN HAYES; KENNETH HILTON
AND DANA HILTON, HIS WIFE; DONNY HOWARD;
FRANKLIN HOWELL; KEVIN HUTCHINSON;
DANNY ISAAC AND SHIRLEY ISAAC, HIS WIFE;
ROBERT JONES AND AMANDA JONES, HIS WIFE;
CLAUDE JUDE AND JENNIFER JUDE, HIS WIFE;
GARY KEENE AND SHIRLEY KEENE, HIS WIFE;
HAROLD KIDD AND LISA KIDD, HIS WIFE;
FARRIS LAWSON AND SARA ELIZABETH
LAWSON, HIS WIFE; NORVAL LAWSON
AND JUANITA LAWSON, HIS WIFE;
HERMAN LITTLE AND ANONA LITTLE,
HIS WIFE; JERRY LITTLE AND SHARON LITTLE,
HIS WIFE; KENNETH LITTLE; KEVIN LITTLE
AND MISSY LITTLE, HIS WIFE;
JOSHUA MAHON; CLINNON MARTIN;
DOUGLAS MARTIN; VAN MAYHORN;
TIMOTHY MAYNARD AND KAYLA MAYNARD,
HIS WIFE; DAVID MCGUIRE AND JULIE MCGUIRE,
HIS WIFE; DANNIE MEADE AND ANDREA MEADE,
HIS WIFE; KENNETH MEADE AND LISA MEADE,

HIS WIFE; QUILLIA MILLER, EXECUTRIX OF
THE ESTATE OF RICKY MILLER; RONALD MILLER
AND TERESA MILLER, HIS WIFE;
FOSTER MITCHELL AND GLADYS MITCHELL,
HIS WIFE; EDWARD MOORE AND ELVIE MOORE,
HIS WIFE; ERNIE MOORE AND RITA MOORE,
HIS WIFE; CHARLES MULLINS; ALLARD NEWSOME;
DALE NEWSOME AND ANITA NEWSOME,
HIS WIFE; DONALD NEWSOME AND DARLENE
NEWSOME, HIS WIFE; JAMES NEWSOME AND
TABITHA NEWSOME, HIS WIFE; JIMMY NEWSOME;
LEROY NEWSOME; TERRY NORMAN;
CYNTHIA PATTON, EXECUTRIX OF THE ESTATE
OF JOHN PATTON; JOHNNY PITTMAN AND
PEGGY PITTMAN, HIS WIFE; JEFFREY POTTER AND
CHARLENE POTTER, HIS WIFE; RANSOM PRATER;
DENNIE PUGH AND MARY PUGH; ROBERT PUGH
AND CELESTE PUGH, HIS WIFE; JIMMY RAY AND
GLENDA RAY, HIS WIFE; LARRY RAY;
DAVID REED AND SUSAN REED, HIS WIFE;
SHERRELL REID; STELFON REYNOLDS AND
EUGENA REYNOLDS, HIS WIFE; JAMES RICH AND
VALERIE RICH, HIS WIFE; MARKUS RICHARDSON
AND CHENDLA RICHARDSON, HIS WIFE;
FREDRICK ROBERS AND CONNIE ROBERTS,
HIS WIFE; RODNEY ROSE AND STEPHANIE ROSE,
HIS WIFE; WILLIAM RUNYON AND KATHY RUNYON,
HIS WIFE; DENNY SEXTON AND ELLEN SEXTON,
HIS WIFE; HERSHEL SHEPHERD;
JAMES SIMMONS AND GINGER SIMMONS,
HIS WIFE; HARVEY SMITH; VERLIN SMITH;
WILLIAM SMITH AND SARA SMITH, HIS WIFE;
EARL SPURLOCK; GERMAN STUMBO;
ELLIS STURGILL AND DARLA STURGILL,
HIS WIFE; PAUL STURGILL; RANDY STURGILL
AND MADGE STURGILL, HIS WIFE;
RICHARD STURGILL AND MELONY
STURGILL, HIS WIFE; DOUGLAS TACKETT;
JAMES TACKETT AND MARY TACKETT,
HIS WIFE; GARRETT TAYLOR AND MELANA
TAYLOR, HIS WIFE; RONALD THACKER
AND LORA THACKER, HIS WIFE; ROY THACKER
AND ANNA THACKER, HIS WIFE;
A.J. THORNSBERRY AND MYRA THORNSBERRY,
HIS WIFE; THOMAS TYREE AND MARY TYREE,
HIS WIFE; STEVE WARD. AND ANNETTE WARD,
HIS WIFE; KEITHAL WHITE AND CONNIE JOYCE

WHITE, HIS WIFE; DONALD WILLIAMS AND
MARY ANN WILLIAMS, HIS WIFE;
MASON WILLIAMS; LORETTA WILLIAMS,
EXECUTRIX OF THE ESTATE OF RANDALL
WILLIAMS; RICKY WILLIAMS AND EUGENIA
WILLIAMS, HIS WIFE; TOMMY WRIGHT
AND VERDIE WRIGHT, HIS WIFE;
DENVER MEADE; ADRIAN CARROLL;
KELLY AKERS; CHRIS BARTLEY AND JUDY
BARTLEY, HIS WIFE; BENJAMIN PERRY AND
ALIVIA PERRY, HIS WIFE; THOMAS BOYD
AND DEBRA BOYD, HIS WIFE; TEDDY JOHNSON
AND DERANDA JOHNSON, HIS WIFE; JOHN ELLISH;
JAMES TACKETT AND LISA TACKETT, HIS WIFE;
DARRELL BENTLY; EDDIE BRANHAM AND DORESSA
BRANHAM, HIS WIFE; GEORGE DAVID JUSTICE AND
MICHELLE DAWN JUSTICE, HIS WIFE; DENVER BAKER
AND MARGARET BAKER, HIS WIFE; STACY TROTTER;
GEORGE NEWSOME AND DIANA NEWSOME, HIS WIFE;
JOHN STEWART AND RUTHIE STEWART, HIS WIFE;
THOMAS LITTLE AND DIANA LITTLE; HIS WIFE;
CRAIG KIDD; LINDEN LEMASTER AND RUBY
LEMASTER, HIS WIFE; PAUL MAYNARD;
ROBERT FLEMING AND GLENDA FLEMING, HIS WIFE;
ROSCOE HOLBROOK AND SANDRA HOLBROOK,
HIS WIFE; PAUL SMITH AND LENA SMITH, HIS WIFE;
TERRY NEWSOME; GREGORY SMITH AND GLENNIS
SMITH, HIS WIFE; HAROLD SCOTT AND DONNA SCOTT,
HIS WIFE; DAVID NEWSOME AND JENNIFER NEWSOME,
HIS WIFE; BEACHER SHEPHARD AND GLENDA SHEPHARD,
HIS WIFE; DAVID MOORE AND DEBBIE MOORE, HIS WIFE;
RANDY SCOTT AND SHARON SCOTT, HIS WIFE;
REFORD BILLITER AND CLARA BILLITER, HIS WIFE;
BILLY BOYD AND KAREN BOYD, HIS WIFE;
DARRELL HOPKINS AND PATRICIA HOPKINS, HIS WIFE;
ROGER MATNEY AND RUBY MATNEY, HIS WIFE;
JAMES VARNEY AND MELISSA VARNEY, HIS WIFE;
HERBERT ADAMS AND JEANNIE ADAMS, HIS WIFE;
TEDDY NEWSOME; STEVE DOTSON AND MELISSA
DOTSON, HIS WIFE; JODY BALDWIN AND SHERRY
BALDWIN, HIS WIFE; LARRY LONGWORTH AND KAREN
LONGWORTH, HIS WIFE; MICHAEL BLACKBURN;
GREGORY SELLARDS AND DEBRA SELLARDS, HIS WIFE;
ERNEST SULLIVAN AND IDA SULLIVAN, HIS WIFE;
DON LYNCH AND MARGARET LYNCH, HIS WIFE;
GEORGE HALL AND MARY HALL, HIS WIFE;
CHUCK.IE BENTLEY AND THERESA BENTLEY, HIS WIFE;

RICKY ESTEPP AND APRIL ESTEPP, HIS WIFE;
TROY HUNT AND BARBARA HUNT, HIS WIFE;
HOYT SMITH AND BLANCHE SMITH, HIS WIFE;
BILL STANCIL AND PATRICIA STANCIL, HIS WIFE;
RODICK JOHNSON AND CRYSTAL JOHNSON, HIS WIFE;
JIMMY YATES; CLINTON COLEMAN AND THERESA
COLEMAN, HIS WIFE; BRIAN COLLINS;
ORVILLE MILLER; CHARLES CANTRELL;
JACKIE FRANCIS AND JOANN FANCIS, HIS WIFE;
JOSEPH HORNE AND LINDA HORNE, HIS WIFE;
ED REYNOLDS AND ANGIE REYNOLDS, HIS WIFE;
ROBERT BRADLEY AND BARBARA BRADLEY,
HIS WIFE; CHRISTOPHER FLEMING AND APRIL
FLEMING, HIS WIFE; PAUL JOHNSON AND LONA
JOHNSON, HIS WIFE; LARRY NEWSOME;
TOMMY ADKINS AND BONNIE ADKINS, HIS WIFE;
CHARLES MULLINS; BILLY RATLIFF AND DEBBIE
RATLIFF, HIS WIFE; RODNEY MILLER AND JANET
MILLER, HIS WIFE; BOBBY MULLINS; CECIL
CHAPMAN AND TAMMY CHAPMAN, HIS WIFE;
KENNY SMALLWOOD AND MILDRED SMALLWOOD,
HIS WIFE; TOMMY ENGLAND AND SYDNEY ENGLAND,
HIS WIFE; ROGER DALE STATON AND BETTY STANTON,
HIS WIFE; CLIFTON CHARLES STREET AND PEGGY
STREET, HIS WIFE; ALBERT JOHNSON AND PATRICIA
JOHNSON, HIS WIFE; DEARL ROBERTS AND REBECCA
ROBERTS, HIS WIFE; JAMES ADAMS;
JAMES R. ADAMS AND SUSIE ADAMS, HIS WIFE;
JAMES ALLEN AND SUSAN ALLEN, HIS WIFE;
BILLY COLLINS AND BRENDA COLLINS, HIS WIFE;
OSCAR COLLINS AND CHRISTY COLLINS, HIS WIFE;
CLIFFORD MAYNARD AND SARAH MAYNARD, HIS WIFE;
TROY MOON AND SYLENA MOON, HIS WIFE;
WILLIAM SHORT; JOSEPH AKERS; CHESTER BAKER
AND LUCINDA AKERS, HIS WIFE; LON COLLIER;
CLEVE THACKER AND WANDA THACKER, HIS WIFE;
STONEY CAUDILL AND TAMMY CAUDILL, HIS WIFE;
RODNEY HAMILTON; GREGORY BARTLEY AND
JEANNETTA BARTLEY, HIS WIFE; ANCIE CASEY AND
VANESSA CASEY, HIS WIFE; ROBERT MAPES;
RODNEY WARD AND TAMMY WARD, HIS WIFE;
PHILLIP HALL AND TAMMY HALL, HIS WIFE;
STEVEN COUCH AND BELINDA COUCH, HIS WIFE;
RONNIE MULLINS AND BONITA MULLINS, HIS WIFE;
DONALD HALL JR., DELBERT HAMILTON AND
DOTTIE SUE HAMILTON, HIS WIFE; KENNITH
JACKSON AND SHARON JACKSON, HIS WIFE;

TERRY STEVENS AND DEBRA STEVENS, HIS WIFE;
AUDY STEWART AND ROSE MARIE STEWART, HIS
WIFE; JAMES ADKINS; JIMMY ADKINS.

V.                                             CAUSE NO:_____

3M COMPANY f/k/a MINNESOTA MINING AND                    DEFENDANTS
MANUFACTURING COMPANY, a foreign corporation;
MINE SAFETY APPLIANCES COMPANY, a foreign corporation;
AMERICAN OPTICAL CORPORATION, a foreign corporation;
CABOT CSC CORPORATION, a foreign corporation;
CABOT CORPORATION, a foreign corporation;
AEARO TECHNOLOGIES, LLC; a foreign corporation;
AEARO LLC, a foreign corporation;
MINE SERVICE COMPANY, INC., a Kentucky corporation;
NETWORK SUPPLY A/K/A NETWORK SUPPLY, INC.
A/K/A ROSWELL, INC.; a Kentucky Corporation;
REGINA MINE SUPPLY, INC., a former Kentucky corporation;
CARBON MINE SUPPLY, LLC, a former Kentucky corporation;
M & M MINE SUPPLY, INC., a Kentucky corporation;
KENTUCKY MINE SUPPLY COMPANY,
a Kentucky corporation.

## NOTICE OF REMOVAL

3M Company gives notice of removing this case from the Circuit Court of Pike County, Kentucky, to the United States District Court for the Eastern District of Kentucky, Southern Division at Pikeville. This is the proper place to remove the state court case (cause number 21-CI-00322), because this District and Division include Pike County, where the case is pending.[1]

## INTRODUCTION

This is one of six nearly identical complaints served on or around the same day by the same attorneys. Collectively, the cases involve 628 Plaintiffs. All six cases name the same thirteen Defendants. Seven Defendants, including 3M, allegedly made respiratory protection equipment the Plaintiffs used in their work as coal miners.[2] The other six Defendants are or were suppliers or distributors of mining equipment, who allegedly sold the respirators to Plaintiffs' employers.[3]

The 3M products at issue are the 3M 8210 N95 respirator and its predecessor products, the 8710, and 8715 respirators. Those products are filtering facepiece respirators that underwent a testing and approval process overseen by the Bureau of Mines and the National Institute for Occupational Safety and Health (NIOSH)—before being sold to the public. NIOSH had and has ongoing supervision over the products'

---

[1]   28 U.S.C. § 1441(a).

[2]   In addition to 3M, the other Respirator Defendants are Mine Safety Appliances Co.; American Optical Corp.; Cabot CSC Corp.; Cabot Corp.; Aearo Technologies, LLC; and Aearo LLC.

[3]   The Supplier Defendants are Mine Service Co., Inc.; Network Supply a/k/a Network Supply, Inc. a/k/a Roswell, Inc.; Regina Mine Supply, Inc.; Carbon Mine Supply, LLC; M&M Mine Supply, Inc., and Kentucky Mine Supply Co.

certification and manufacture. The central theme of Plaintiffs' case against 3M, and indeed against the other Respirator Defendants—expressed in all six complaints—is that NIOSH erred by continuing to certify certain respirators, and that 3M and the other Respirator Defendants induced NIOSH's error through a long-running fraud perpetrated on the agency, one presumably continuing through today, given the fact that the 8210 N95 respirator continues to be certified today—indeed, it is a highly recognizable part of the global battle against Covid-19. 3M denies Plaintiffs' allegations.

## <u>GROUNDS FOR REMOVAL</u>

This case is removable under 28 U.S.C. § 1441, because it could have been filed in this Court under both 28 U.S.C. §§ 1331 and 1332.

First, Plaintiffs' Complaint supports jurisdiction under the Class Action Fairness Act (CAFA). The Complaint joins the claims of more than 100 persons with supposed common questions of law or fact, and is therefore a "mass action" under CAFA. Mass actions may be litigated in federal court.

Second, the case presents a federal question, because the Complaint alleges that 3M and other Respirator Defendants misled a federal agency (NIOSH) for decades. These fraud-on-NIOSH allegations, the lynchpin of Plaintiffs' claims, implicate important national interests meriting a federal forum.

Finally, diversity jurisdiction also exists because Plaintiffs are citizens of different states than all properly joined Defendants. The non-diverse Defendants—the Supplier Defendants, who allegedly sold respirators to Plaintiffs' coal mine employers—are improperly joined. Under Kentucky's Middleman Statute, K.R.S. § 411.340, Plaintiffs have no claim against the Suppliers. Even accepting the facts asserted in the Complaint

4862-9853-5424, v. 1

as true, the Suppliers had no reason to conclude that 3M's respirators were defective, and therefore cannot be liable for alleged defects in those products.

### I. This Court has jurisdiction under CAFA.

CAFA expanded federal diversity jurisdiction to include jurisdiction over "class actions" and "mass actions." For both categories, CAFA requires only minimal diversity: only one plaintiff and one defendant need to be citizens of different states.[4] The statute grants federal jurisdiction over a minimally diverse mass action if the aggregate amount in controversy exceeds $5,000,000.[5] Mass actions filed in state court are removable to federal court.[6]

### A. This case is a mass action.

This is a mass action, a "civil action . . . in which monetary relief claims of 100 or more persons are proposed to be tried jointly on the ground that the plaintiffs' claims involve common questions of law or fact."[7]

Plaintiffs do not have to demand a joint trial formally or explicitly for their case to qualify as a mass action. A "proposal for a joint trial can be implicit [and] one complaint implicitly proposes one trial."[8] A complaint's language reinforces that implication where

---

[4]   28 U.S.C. § 1332(d)(2)(A).

[5]   *Id.* §§ 1332(d)(2), d(6).

[6]   *Id.* § 1453(b).

[7]   *Id.* § 1332(d)(11)(B).

[8]   *In re Abbott Lab'ys, Inc.*, 698 F.3d 568, 572 (7th Cir. 2012) (citing *Bullard v. Burlington Northern Santa Fe Railway Co.*, 535 F.3d 759, 761 (7th Cir.2008)); *see also Ramirez v. Vintage Pharms., LLC*, 852 F.3d 324, 329 (3d Cir. 2017); *Visendi v. Bank of Am., N.A.*, 733 F.3d 863, 868 (9th Cir. 2013); 2 William B. Rubenstein, *Newberg on Class Actions* § 6:24 (5th ed. – June 2021 Update) ("[C]ourts have

it demands, for example, "a jury trial," instead of multiple or separate trials; "an award of damages," instead of multiple awards; or "a judgment," instead of multiple judgments."[9]

This Complaint joins 248 Plaintiffs, far more than necessary for CAFA's mass action jurisdiction. Their joinder in a single Complaint implies joinder for trial, and the implication is reinforced by the Complaint's language: Plaintiffs pray for "*a trial by jury*," not multiple trials, and a singular "judgment," not multiple judgments.[10] This is more than enough to be considered a proposal for a joint trial under CAFA.

The Complaint also asserts that a common question of law or fact is shared among the Plaintiffs. As in the Federal Rules, joinder of plaintiffs under the Kentucky Rules of Civil Procedure requires a "question of law or fact common to all these persons" to "arise in the action."[11] Because Plaintiffs have joined in a single filing, they have necessarily proposed that such a common question exists.[12]

---

concluded that a state court complaint which joins more than 100 plaintiffs satisfies this requirement.").

[9]  *Ramirez*, 852 F.3d at 329.

[10]  Complaint (attached as part of the state court record, Exhibit 1) at p. 50.

[11]  *Compare* Ky. R. Civ. P. 20.01 *with* Fed. R. Civ. P. 20(a)(1)(B).

[12]  3M will file a separate motion seeking relief from Plaintiffs' improper joinder. But that makes no difference to the propriety of this removal, because the Court's jurisdiction is determined at the time of removal, not by post-removal developments. *Visendi*, 733 F.3d at 868 ("[T]he district court's post-removal conclusion that Plaintiffs' claims were improperly joined does not affect the court's jurisdiction, because—at the time of removal—Plaintiffs proposed a joint trial.").

4862-9853-5424, v. 1

**B.    This case satisfies CAFA's minimal diversity and amount-in-controversy requirements.**

Minimal diversity exists in this case, as Plaintiffs are overwhelmingly citizens of Kentucky and 3M is a citizen of Minnesota.[13] The case also satisfies the $5,000,000 threshold. A "notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold. Evidence establishing the amount is required . . . only when the plaintiff contests, or the court questions, the . . . allegation."[14]

It is apparent from the Complaint that the amount in controversy plausibly exceeds $5,000,000. With 248 Plaintiffs, that requires only $20,161.29 in controversy per plaintiff—a very low sum for any significant personal injury case. As explained in Section III.B below, in examining the amount in controversy, the Court can consider the categories and nature of the damages asserted in the Complaint.[15] And punitive damages are a component too: when such damages are pleaded, and where "state law at least arguably permits the type of damages claimed," the Court can assume a single-digit punitive damages multiplier.[16]

---

[13]  Complaint (attached as part of the state court record, Exhibit 1) at ¶¶ 2, 4; *see also* Kentucky Secretary of State, Business Entity Search, https://web.sos.ky.gov/ftshow/(S(hygbzx3vdvds2avulotgcny3))/default.aspx?path=ftsearch&id=0144664&ct=09&cs=99998&ce=eILrCJw2VVf0F70UtpTkb6nWyz16FiUnOdedL2NuFFzRskC1rYkQcqDO8Afr9HiE (last accessed Oct. 18, 2021).

[14]  *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 89 (2014).

[15]  *E.g.*, *Hayes v. Equitable Energy Res. Co.*, 266 F.3d 560, 573 (6th Cir. 2001); *Luckett v. Delta Airlines, Inc.*, 171 F.3d 295, 298 (5th Cir. 1999).

[16]  *Kovacs v. Chesley*, 406 F.3d 393, 397 (6th Cir. 2005); s*ee also Heyman v. Lincoln Nat'l Life Ins. Co.*, 781 F. App'x 463, 471-472 (6th Cir. 2019); *Hollon v. Consumer Plumbing Recovery Ctr.*, 417 F. Supp. 2d 849, 853 (E.D. Ky. 2006).

The categories of damages alleged in the Complaint are numerous and serious, as also detailed in Section III.B below. Any one of those categories, standing alone, would show an amount in controversy per-plaintiff greater than $20,161.29. Cumulatively, the categories far exceed that sum. Punitive damages make the point even stronger. Assuming a very conservative 2:1 punitive damages ratio, the per-plaintiff amount in controversy for compensatory damages need only be $6,720.43 to arrive at the jurisdictional threshold (*i.e.*, $6,720.43 in compensatory damages + $13,440.86 in punitive damages = $20,161.29). Once again, as shown in Section III.B, juries in other respirator cases in the counties within this District and Division have returned large, multi-million dollar verdicts even for individual plaintiffs. One jury returned a verdict of $67.5 million.

## C.    No CAFA exception applies.

The "party seeking to remand under an exception to CAFA bears the burden of establishing each element of the exception by a preponderance of the evidence."[17] This burden allocation is applied in "every circuit."[18] Congress intended CAFA to be applied broadly, and its exceptions to apply narrowly.[19] 3M cannot anticipate what exceptions Plaintiffs might assert, and will not attempt to address every element of every exception

---

[17]  *Mason v. Lockwood, Andrews & Newnam, P.C.*, 842 F.3d 383, 388 (6th Cir. 2016) (collecting cases).

[18]  *Id.*

[19]  *Graiser v. Visionworks of Am., Inc.*, 819 F.3d 277, 287 (6th Cir. 2016) ("Congress clearly 'intended [CAFA] to expand substantially federal court jurisdiction over class actions' and directed that CAFA's 'provisions should be read broadly, with a strong preference that interstate class actions should be heard in a federal court if properly removed by any defendant.'" (quoting S. Rep. 109–14, at 43 (2005))).

here. Rather, 3M reserves the right to put Plaintiffs to their proof and present argument on any element.

It is enough, for now, to observe that two of the most commonly-discussed CAFA exceptions—the "local controversy" and "home state controversy" exceptions—do not apply.

These exceptions require, among other things, a *non-diverse* defendant "from whom significant relief is sought by members of the plaintiff class" and "whose alleged conduct forms a significant basis for the claims asserted by the proposed class" or who is the "primary defendant" in the suit.[20] There is no such defendant: the only non-diverse defendants—the Supplier Defendants—are fraudulently joined, as explained in Section III.A.ii below. There is not even a colorable claim against the Supplier Defendants, much less a significant one.

But even if the Supplier Defendants were properly joined, they still would not satisfy the "significance" standard necessary to trigger a CAFA exception. "Significance" is relative; it calls for "comparing the local defendant's alleged conduct to the alleged conduct of all the Defendants."[21] And the "significant relief" component requires that "every potential plaintiff is entitled to recover from" the defendant in question.[22] The term "primary defendant" connotes an even higher standard—that the defendant in

---

[20]  28 U.S.C. § 1332(d)(4)(A)-(B).

[21]  *Johnson v. BLC Lexington SNF, LLC*, No. CV 5:19-064-DCR, 2019 WL 2216441, at *4 (E.D. Ky. May 22, 2019) (citing *Mason v. Lockwood, Andrews & Newnam, P.C.*, 842 F.3d 383, 395-96 (6th Cir. 2016)).

[22]  *Id.*

question is the "real target of the lawsuit," the person or entity that would "incur most of the loss if liability is found."[23]

To address these exceptions, we must suspend reality and assume, for argument's sake only, that Plaintiffs might prove some case against the Supplier Defendants, notwithstanding their historical utter failure to do so, or even to attempt to do so. Even if the Supplier Defendants had *any* exposure (despite the operation of the Middleman statute that makes them immune and the fact that several have not done business for decades), it would not be relatively *more* significant than the exposure of the respirator defendants like 3M—as would be required to satisfy one of the exceptions. The Suppliers' exposure is entirely dependent on, and derivative of, the Respirator Defendants' exposure. One cannot be liable for distributing a defective product unless the product was, in fact, defective. And the entity liable for manufacturing a defective product is the manufacturer. Not surprisingly, the legislative history for CAFA specifically identifies local dealers/sellers in product liability cases as entities that do not meet CAFA's "significance" standard.[24]

Nor could every joined Plaintiff recover from the same Supplier Defendant. Plaintiffs and their decedents will have connections to various coal mines, which were in turn serviced by various equipment distributors. Plaintiffs and their decedents will have varying work histories and tenures, which will again affect the Supplier Defendants with

---

[23] *Powell v. Tosh*, No. 5:09-CV-000121-TBR, 2009 WL 3484064, at *10 (W.D. Ky. Oct. 22, 2009) (quoting S. Rep. No, 109-14, at 43-44 (2005)); *see also Kendrick v. Standard Fire Ins. Co.*, No. CIV.A.06 141 DLB, 2007 WL 1035018, at *5 (E.D. Ky. Mar. 31, 2007).

[24] *Eakins v. Pella Corp.*, 455 F. Supp. 2d 450, 452 (E.D.N.C. 2006) (quoting and discussing S. Rep. 109-14, at 40 (2005)).

whom they have a factual connection. Hence, no Supplier Defendant can be the source of "significant relief" as that term is used in CAFA precedent. No one Supplier Defendant is answerable to the whole class.

And, for essentially the same reasons, no Supplier Defendant is the "real target" of the litigation who will incur most of the loss in an adverse verdict and judgment. Indeed, there is no reason to think a Supplier Defendant will incur any liability, much less the bulk of liability.

In sum, CAFA jurisdiction applies and the two most commonly-discussed exceptions to CAFA jurisdiction do not apply. The case is removable under CAFA.

### II.    This Court has federal question jurisdiction.

Congress has authorized two paths for claims to "arise under" federal law, for purposes of 28 U.S.C. § 1331.[25] The first, "when federal law creates the cause of action asserted,"[26] is not applicable. But even a state-law claim may "arise under" federal law.[27] The Supreme Court has "condensed" this second path into a clear test.[28] "[F]ederal jurisdiction over a state-law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress."[29]

---

[25]  *Gunn v. Minton*, 568 U.S. 251, 257 (2013).

[26]  *Id.*

[27]  *Id.* at 258.

[28]  *Id.*

[29]  *Id.*

Where—as here—these elements exist, federal "jurisdiction is proper because there is a 'serious federal interest in claiming the advantages thought to be inherent in a federal forum,' which can be vindicated without disrupting Congress's intended division of labor between state and federal courts."[30] The absence of a federal private right of action is "not dispositive of" congressional intent.[31]

Count Four of the Complaint is a claim for intentional misrepresentation and fraud, alleging that 3M duped federal agencies into maintaining the certification of 3M respirators as compliant with federal law.[32] In Plaintiffs' view, 3M didn't comply with NIOSH directives, inform purchasers its respirators couldn't satisfy federal certification requirements, or redesign the respirators to satisfy those federal requirements.[33] Plaintiffs also allege 3M fraudulently represented its respirators complied with federal law when they didn't,[34] and violated a federal statutory duty[35] to disclose that its respirators didn't comply with federal law.[36] And Plaintiffs make similar allegations against the other Respirator Defendants. These allegations intertwine with Plaintiffs'

---

[30]  *Id.* (quoting *Grable & Sons Metal Prods., Inc v. Darue Eng'g & Mfg.*, 545 U.S. 308, 313–14 (2005)).

[31]  *Grable*, 545 U.S. at 318 (discussing *Merrell Dow Pharma. Inc v. Thompson*, 478 U.S. 804 (1986)).

[32]  Complaint (attached as part of the state court record, Exhibit 1) at ¶ 39. For simplicity, 3M subsequently refers to this count as the "fraud claim."

[33]  *Id.*

[34]  *Id.*

[35]  30 U.S.C. § 820(h).

[36]  Complaint (attached as part of the state court record, Exhibit 1) at ¶ 41.

10

other Counts. For example, Plaintiffs also plead that 3M and other Respirator Defendants were *negligent* in "failing to manufacture a respirator which complied with federal certification regulations."[37] Given the fact that one of the respirators central to Plaintiffs' claims—the 8210 N95 respirator—continues to be certified, Plaintiffs presumably contend that the fraud has continued to date.

Those claims—which 3M denies—necessarily raise a substantial question of federal law. Federal resolution of that issue will not upset the congressionally sanctioned balance between federal and state courts. Plaintiffs' claims thus arise under federal law and fall within the Court's original jurisdiction, under 28 U.S.C. § 1331.

### A. Plaintiffs' fraud claim "necessarily raises" a federal question, because it can't be evaluated without analyzing and interpreting federal law and regulations.

When a court must resolve a federal issue to rule on the plaintiff's claim, the federal issue is "necessarily raised."[38] For example, resolution of a federal patent issue was necessary to resolving a legal-malpractice claim where the plaintiff had to prove that, had the defendant attorney litigated the federal patent issue, an earlier lawsuit's outcome would have been different.[39] Similarly, interpretation of an Internal Revenue Code provision was a federal issue that was necessarily raised where the defendant

---

[37]  *Id.* at ¶ 28. Plaintiffs further allege that the Respirator Defendants used "governmental approval as a cover for selling" defective products and failed to "implement or enforce a valid quality control program to insure [*sic*] respirators were manufactured in compliance with federal certification regulations." *Id.*

[38]  *Gunn*, 568 U.S. at 259.

[39]  *Id.*

11

allegedly breached a contractual duty not to violate the provision; the plaintiff also alleged the defendant had fraudulently concealed the violation.[40]

Here, interpretation and analysis of federal regulations is not only central, but essential to Plaintiffs' state-law claims. To prevail on a Kentucky fraud claim, a plaintiff must prove, among other elements, that the defendant made a false representation knowingly or with reckless disregard for the representation's truth.[41] Plaintiffs' fraud claim is about an alleged fraud first made on the federal government before its effects could be felt by the public. In various ways, Plaintiffs allege that 3M's products did not comply with federal regulations and that it was fraudulent for 3M to represent that the products did.[42] But federal agencies (U.S. Bureau of Mines, MSHA and NIOSH)[43] did, in fact, certify the products at issue beginning in 1972 and continue to do so today as to the 8210 N95 respirator.[44] And as Plaintiffs allege, NIOSH's regulations were, during the

---

[40] *Mikulski v. Centerior Energy Corp.*, 501 F.3d 555, 569 (6th Cir. 2007) (*en banc*).

[41] *Epps Chevrolet Co. v. Nissan N. Am., Inc.*, 99 F. Supp. 3d 692, 706 (E.D. Ky. 2015) (citation omitted).

[42] Complaint (attached as part of the state court record, Exhibit 1) at ¶ 39.

[43] In 1995, MSHA "transferr[ed] the requirements for approval of respirators from 30 CFR part 11 to NIOSH, which is publishing the requirements elsewhere in this separate part of the Federal Register as a new 42 CFR part 84." Respiratory Protective Devices, 60 Fed. Reg. 30398-01, 30399 (June 8, 1995), *available at* 1995 WL 337816.

[44] Exhibit 2 (May 24, 1972 Letter from Bureau of Mines to 3M Company; 8710 respirator) at 1-2; Exhibit 3 (Apr. 14, 1986 Letter from Mine Safety and Health Administration and NIOSH to 3M Co.; 8715 respirator) at 1-2; Exhibit 4 (Aug. 16, 1995 Letter from NIOSH to 3M Co.; 8210 respirator), at 1-2. The Court may take judicial notice of these documents, matters of public record. *See, e.g.*, *Bailey v. City of Ann Arbor*, 860 F.3d 382, 386 (6th Cir. 2017). The Complaint also makes 3M's allegedly fraudulent obtaining of NIOSH's approval "central" to the fraud claim and alleges that "the governmental approval" operated as "cover," Exhibit 1 at ¶ 28, so

---

12

relevant time, codified at "30 C.F.R. part 11."[45] Plaintiffs allege that 3M had a federal "statutory duty to disclose federal certification non-compliance," under "30 U.S.C. § 820 (h) (1969-2014)."[46] And they allege that, given this federal statutory duty, 3M should have "disclose[d] that it was selling … respirators which failed to meet the certification and performance criteria under 30 C.F.R. part 11 (1974-1998)."[47]

Given these claims, Plaintiffs must prove either that 3M secretly knew that its respirators did not comply with federal law, even though federal agencies said they did; or that 3M acted with reckless disregard as to its compliance with that federal law. Proving those claims will necessarily require the trier of fact to analyze and interpret federal law and regulations. To prevail, Plaintiffs will have to prove that 3M defrauded federal agencies into maintaining its respirators' certification and that the agencies improperly discharged their duties.

In other words, just as in *Gunn*, to prove their state-law fraud claim, the Plaintiffs will have to prove what federal law required 3M to do, and what federal law required the agencies to do.[48] Plaintiffs' claim thus will "necessarily require application of [federal] law to the facts of [their] case[s]."[49]

---

these documents are properly considered along with the Complaint, *see, e.g.*, *Luis v. Zang*, 833 F.3d 619, 626 (6th Cir. 2016).

[45]  Complaint (attached as part of the state court record, Exhibit 1) at ¶ 41.

[46]  *Id.*

[47]  *Id.*

[48]  *Gunn*, 568 U.S. at 259.

[49]  *Id.*

**B.    The federal issue is "actually disputed."**

The next requirement is straightforward. If the parties disagree about the federal issue's resolution, then it is actually disputed.[50] Of course, 3M hotly disputes any allegations that it perpetuated (and is continuing to perpetuate during a global pandemic) a massive, decades-long fraud on the federal government, such that several federal agencies misapplied federal law when re-certifying 3M's respirators as compliant with 30 C.F.R. part 11. And 3M expects that the other Respirator Defendants will dispute the same types of allegations levied at them. That shows the issue is "actually disputed."[51]

**C.    The federal issue is "substantial," because its resolution is important to the federal system as a whole.**

"The substantiality inquiry" considers "the importance to the federal system as a whole."[52] "[I]t is not enough that the federal issue be significant to the particular parties in the immediate suit."[53] To evaluate substantiality, the Sixth Circuit considers:

> (1) whether the case includes a federal agency, and particularly, whether the agency's compliance with a federal statute is in dispute;
>
> (2) whether the federal question is important (*i.e.*, not trivial);
>
> (3) whether a decision on the federal question will resolve the case (*i.e.*, the federal question is not merely incidental to the outcome); and

---

[50]  *Gunn*, 568 U.S. at 259 (citing *Grable*, 545 U.S. at 313).

[51]  *Id.*

[52]  *Id.* at 260.

[53]  *Id.*

(4) whether a decision on the federal question will control many other cases (*i.e.*, the issue is not anomalous or isolated).[54]

"[N]o single factor is dispositive and these factors must be considered collectively, along with any other factors that may be applicable in a given case."[55] Some examples of what does *not* qualify:

- Allegations that a defendant intentionally misinterpreted an Internal Revenue Code provision did *not* present a substantial federal question, where the "case involve[d] no question of whether a government agency ha[d] complied with a statute or regulation."[56] Because an agency's action wasn't at issue, the federal government had only a "limited interest" in the litigation.[57] Resolution of the federal issue would have "provide[d] little if any precedent for future cases," and did not "implicate any broader or more substantial issues,"[58] because the "particular and very narrow" issue had "been at least partially superseded" by statute, so its resolution would "not be controlling over numerous other cases."[59]

---

[54] *Estate of Cornell v. Bayview Loan Serv., LLC*, 908 F.3d 1008, 1015 (6th Cir. 2018) (internal quotation marks and citation omitted).

[55] *Mikulski*, 501 F.3d at 570.

[56] *Mikulski*, 501 F.3d at 569-71.

[57] *Id.* at 570.

[58] *Id.* at 571.

[59] *Id.*

15

- Likewise, an alleged breach of a consent decree was similarly not important to the federal system as a whole, where it did not concern a federal agency's action.[60]

By contrast, where a federal agency's application of its regulations is central to the dispute (even when the agency itself is not a party), the case *does* present a substantial federal question. In *Grable*, for example, a quiet title action between two private citizens turned on whether the IRS had improperly applied a federal statute. That issue was substantial, because the federal system had "a direct interest in the availability of a federal forum," to adjudicate federal administrative action.[61]

And, allegations very similar to those here—that a federal agency would have acted differently had the defendant not "intentionally withheld the truth about its products and its risks"—also presented a substantial federal issue in the Eastern District of Missouri case *Bader Farms, Inc. v. Monsanto Co.*, even though the allegations were part of a state-law claim.[62] There, the maker of genetically-modified seeds allegedly deceived a sub-agency of the U.S. Department of Agriculture into deregulating the seeds, setting in motion a chain of events that harmed the crops of other farmers not using those seeds. The alleged deception of a federal agency was the first link in the chain. Finding a substantial federal question, the *Bader Farms* court reasoned that

---

[60] *Ohio ex rel. Skaggs v. Brunner*, 549 F.3d 468, 476 (6th Cir. 2008).

[61] *Grable*, 545 U.S. at 315.

[62] *Bader Farms, Inc. v. Monsanto Co.*, No. 1:16-cv-299 SNLJ, 2017 WL 633815, at *2-3 (E.D. Mo. Feb. 16, 2017).

"whether federal regulatory bodies fulfilled their duties with respect to the entities they regulate is 'inherently federal in character.'"[63]

Plaintiffs' allegations, like the claims in *Grable* and *Bader Farms*, satisfy the Sixth Circuit's four substantiality factors. *First*, unlike other cases where this Court has concluded federal jurisdiction is not satisfied,[64] a federal agency's "compliance with [applicable] federal" regulations is plainly "in dispute."[65] In 1972, the Bureau of Mines granted "approval certification of 3M's No. 8710 single-use dust respirator under 30 CFR, Part 11" and told 3M it could "publicize the fact that your product has met the requirements of 30 CFR, Part 11."[66] In 1986, the Mine Safety and Health Administration and NIOSH approved 3M's 8715 respirator and told 3M it could "publicize the fact that the product has met the requirements of 30 CFR Part 11."[67] Similarly, in 1995 NIOSH approved the 3M 8210 respirator and told 3M it could "publicize the fact that this respirator has met the requirements of the Code of Federal Regulations, Title 42, Part 84."[68] Those certifications remained in place for years  as to the predecessor products, and the 3M 8210 respirator remains certified.

---

[63]  *Id.* at *3 (quoting *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001)).

[64]  *See, e.g., Wolford v. Bayer Corp.*, No. 7:16-227-KKC-HAI, 2017 WL 5665332, at *4 (E.D. Ky. Nov. 27, 2017) (concluding issue not substantial where it didn't require court to review agency's compliance with federal law).

[65]  *See Mikulski*, 501 F.3d at 570.

[66]  Exhibit 2 [1972 letter] at 1-2.

[67]  Exhibit 3 [1986 letter] at 1-2.

[68]  Exhibit 4 [1995 letter] at 1-2.

17

These agencies did not act arbitrarily.[69] Like any agency, they applied federal law and rendered a ruling. Plaintiffs allege that the Respirator Defendants defrauded the agencies. This puts the question of whether the agencies properly performed their duties under federal law squarely at the heart of this case. As in *Grable*, the federal system has a direct interest in providing a federal forum to these parties, given that federal administrative action is going to be on trial.  And the dispute will "center [ ] on the action of a federal agency . . . and its compatibility with a federal [regulation]."[70]

*Second*, this federal question is "important," "not trivial."[71] The regulations that Plaintiffs put at issue, including those codified at 30 C.F.R. Part 11, resulted from the "integration of all respirator approval schedules into a single rule."[72] If Plaintiffs are right, then the agencies were prevented from carrying out their regulatory duties under this vital rule, based on a massive fraud. The process by which these federal agencies regulated respirators, and the decisions they made for decades, would be undermined if these claims were true. Plaintiffs' allegations have profound implications for the way the agencies maintain approval over all certified respiratory protection products (including

---

[69] *See, e.g.*, *U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001) ("[A] presumption of regularity attaches to the actions of Government agencies.").

[70] *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 700 (2006) (discussing *Grable*, 545 U.S. at 313).

[71] *Mikulski*, 501 F.3d at 570.

[72] David Spelce *et al.*, *History of U.S. Respirator Approval (Continued) Particulate Respirators*, 36 J. Int'l Soc. Respiratory Protection, vol. 2, 37-55 (2019), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7307331/.

18

those being used during the Covid-19 pandemic), not just the particular respirators the Plaintiffs have placed at issue.

*Third*, the federal question is far from "merely incidental to the outcome."[73] Whether the federal agencies correctly exercised their duties under federal law is central to Plaintiffs' fraud claim. If that federal issue is resolved in 3M's favor, then Plaintiffs' fraud claim fails, and their other tort claims are called into serious question.

*Fourth*, resolution of this federal issue will potentially control other cases where plaintiffs allege that 3M perpetrated a fraud on the federal government. 3M was an innovator of filtering-facepiece respirators.[74] Plaintiffs' fraud claims will require the jury determine whether federal agencies correctly applied federal law to maintain the certification of those products. And that resolution will arguably control subsequent cases presenting the same theories.[75]

Plaintiffs say 3M's actions perpetrated a fraud on federal agencies, a fraud allegedly so effective as to cause the agencies to misapply, for decades, regulations they wrote and administered. In this case, as in *Bader Farms*, Plaintiffs' claim is "dependent on a finding that the agency decision . . . was incorrect" because, allegedly, the Defendant had fraudulently not disclosed the truth about its product.[76] And, in this case

---

[73] *Mikulski*, 501 F.3d at 570.

[74] *See* Exhibit 5 (3M Science of Safety Product Timeline) (noting 3M "[l]aunched [the] first NIOSH-approved filtering facepiece respirator").

[75] *See Gunn*, 568 U.S. at 262.

[76] *King v. Monsanto Co.*, No. 1:19-cv-00129-SNLJ, 2019 WL 5213036, at *2 (E.D. Mo. Oct. 16, 2019) (discussing *Bader Farms*).

as in that one, the claim also "purports to assert a right under federal statute" and "asserts that defendants violated [a] federal statute or regulation."[77] These claims are "facially dependent on the interpretation and application of the federal regulatory process" by which a federal agency "regulat[ed] the use of [the] products."[78] They therefore present a substantial federal issue.[79]

> **D. Resolving this federal issue in federal court doesn't upset Congress's balance between federal and state courts, because state courts don't have a special responsibility for the issue.**

A federal court lacks jurisdiction if federal resolution of the federal issue that the state-law claim raises would disrupt the congressionally sanctioned balance between federal and state courts.[80] Courts have found the federal-state balance is upset when states have a special responsibility for regulating the area at issue.

For example, states have a special responsibility for maintaining licensing standards for professionals, such as lawyers.[81] And that responsibility is particularly acute for lawyers, who are essential to state judicial systems and are traditionally officers of those systems.[82] So, the Supreme Court found in *Gunn* that a malpractice claim was not appropriate for federal resolution.

---

[77] *Id.*

[78] *Id.*

[79] *Id.*

[80] *Gunn*, 568 U.S. at 264.

[81] *Id.*

[82] *Id.*

Similarly, courts have found that insurance claims can't appropriately be resolved in federal court without upsetting the balance. Through the McCarran-Ferguson Act and ERISA, Congress has chosen to leave insurance regulation to the states.[83] A suit involving insurance premiums thus could not be resolved in federal court without usurping that congressional choice.[84]

But when cases turn on interpreting federal statutes and regulations, their resolution in federal court does not upset the federal-state balance. So, for example, state breach-of-contract cases requiring interpretation of the Housing and Community Development Act (and its regulations) can be resolved in federal court, without disrupting the congressionally sanctioned balance.[85] This is true even though claims for breach of contract are plainly state-law claims.

It's true here, too. A federal court's resolution of the federal issues Plaintiffs raise won't upset the congressional balance between federal and state courts. Plaintiffs' allegations do not involve an area over which states have any special responsibility.

---

[83] *See* 15 U.S.C. § 1011 *et seq.* (McCarran-Ferguson Act); 29 U.S.C. § 1191(a)(1) (ERISA provision excepting insurance from complete preemption).

[84] *Hartland Lakeside Joint No. 3 Sch. Dist. v. WEA Ins. Corp.*, 756 F.3d 1032, 1035 (7th Cir. 2014).

[85] *Evergreen Square of Cudahy v. Wis. Hous. & Econ. Dev. Auth.*, 776 F.3d 463, 467-68 (7th Cir. 2015); *One & Ken Valley Hous. Grp. v. Me State Hous. Auth.*, 716 F.3d 218, 224-25 (1st Cir. 2013).

Instead, they concern whether federal agencies properly performed their duties under federal law. "This is not an area of concern traditionally reserved to the states."[86]

The Plaintiffs' allegations require a close analysis of federal regulations that govern respirator certification and re-certification. Resolving that issue in federal court doesn't upset any congressionally sanctioned balance between state and federal courts.[87] Indeed, the federal government has a vital interest in the uniformity of such decisions. As one court put it, the "substantial federal question of whether the actions of a federal agency were correct" is one that "deserves the 'hope of uniformity that a federal forum offers on federal issues.'"[88]

Plaintiffs may assert that federal jurisdiction over their claims would improperly open the floodgates to federal court. Thousands of Plaintiffs have respirator claims pending against 3M in Kentucky state courts. But the Court need not be concerned that permitting a removal of some of those cases will improperly swamp federal courts with state-law claims.

*First*, when the seminal *Grable* decision expressed concern about not sweeping "garden variety state tort" claims into federal court, it was concerned about negligence

---

[86] *Chrisopherson v. Bushner*, No. 6:19-03267-CV-RK, 2021 WL 1692151, at *12 (W.D. Mo. Apr. 29, 2021) (concluding "issue of whether FEMA's map changes were proper" and complied with "relevant federal statutes and regulations" was substantial federal question satisfying federal jurisdiction), *appeal docketed*, 2021 WL 1692151 (June 30, 2021).

[87] *See Evergreen Square*, 776 F.3d at 467-68; *One & Ken Valley*, 716 F.3d at 224-25; *Bader Farms*, 2017 WL 633815, at *3.

[88] *Christopherson*, 2021 WL 1692151, at *12 (quoting *Grable*, 545 U.S. at 312).

*per se* liability.[89] The fear was that whenever a plaintiff alleged that a defendant was liable under state law because the defendant had broken federal "mislabeling" law or committed any "other statutory violations," all of those cases would be swept into federal court.[90] The Supreme Court was rightly wary of allowing this without an indication that was Congress's intent.[91]

That is not the situation here. Plaintiffs do not simply assert that 3M was negligent *per se* based on a simple statutory violation or mislabeling. Although the Plaintiffs allege that 3M violated a statutory duty, the core of their fraud theory is that 3M perpetrated such a massive, long-standing fraud on several federal agencies that *the agencies improperly regulated 3M's respirators* for decades, along with the products manufactured by other Respirator Defendants.[92]

This is no "garden variety" tort claim that 3M is negligent because it allegedly violated a statute. Rather, this fraud-on-the-agency theory requires a close look at whether the alleged fraud meant federal agencies couldn't properly do what federal law required of them. Accepting federal jurisdiction over that particular claim does not open the doors of the federal courthouse anytime a plaintiff alleges a defendant's violation of federal law makes it liable under state law.

---

[89] *See Grable*, 545 U.S. at 318-19 (collecting authorities discussing "negligence per se" liability theories).

[90] *Id.* at 319 ("A general rule of exercising federal jurisdiction over state claims resting on federal mislabeling and other statutory violations would thus have heralded a potentially enormous shift of traditionally state cases into federal court.").

[91] *See id.*

[92] Complaint (attached as part of the state court record, Exhibit 1) at ¶¶ 39-44.

*Second*, and relatedly, Plaintiffs' theory in this case is particular to the attorneys representing them. While their counsel makes these extraordinarily detailed (and federally dependent) claims on behalf of clients in this litigation,[93] those claims are unusual. Plaintiffs represented by other counsel typically do not make the same allegations about a massive federal fraud.[94] So federal jurisdiction over *these* Plaintiffs' particular claims will not mean that *every other* plaintiff's run-of-the-mill tort claim against 3M will be removable for the reasons presented here.

*Third*, it's likely that only a small percentage of the respirator claims now pending will be fully worked up and tried. Inherent in efficiently managing complex litigation, bellwether or test cases are used to give parties reliable data on which to base future case management decisions.[95] That's equally true whether the claims are in state or federal court. Given the substantial federal issue that the Plaintiffs raise, a federal

---

[93] For example, 3M directs the Court to the contemporaneously filed notices of removal in *Banks v. 3M Co.*; *Combs v. 3M Co.*; *Hamilton v. 3M Co.*; *Mounts v. 3M Co.*; and *Yates v. 3M Co.* Those actions involve materially identical complaints, filed on behalf of similarly situated plaintiffs by the same counsel as this action. The Court may take judicial notice of these matters of public record on "its own docket." *Sheldon v. Lundergan Grimes*, No, 14-60-DLB-JGW, 2014 WL 12925536, at *4 (E.D. Ky. Aug. 26, 2014).

[94] *See, e.g.*, Exhibit 6 (Complaint in *Strunk v. 3M Co.* (Leslie Cir. Ct. Aug. 31, 2020)) ¶ ¶ 38-47. This complaint pleads an ordinary state-law fraud claim, making no allegations about 3M's allegedly defrauding the federal government into certifying its respirators. Again, the Court may take judicial notice of this matter of public record, filed in a Kentucky circuit court. *See, e.g.*, *Blevins v. Phillips*, No. 10-00107-HRW, 2011 WL 5404559, at *2 (E.D. Ky. Nov. 8, 2020) (taking judicial notice of Kentucky circuit court's docket).

[95] Federal Judicial Center, *Manual for Complex Litigation* § 22.315 (4th ed. 2004), *available at* https://www.uscourts.gov/sites/default/files/mcl4.pdf.

4862-9853-5424, v. 1

court is the appropriate forum for those relatively few test cases. Once they are resolved, the rest of the inventory likely will follow.

Plaintiffs have chosen to allege that 3M committed a massive fraud, so effectively that it allegedly duped federal agencies and prevented them from properly applying federal law. This claim necessarily raises a disputed, substantial issue of federal law with profound implications for several federal agencies' application of federal law, over several decades. Resolving that issue in federal court will not thwart any congressionally sanctioned balance between state and federal courts. The Court should conclude that because Plaintiffs have chosen to assert a fraud claim that arises under federal law, federal question jurisdiction exists.

### III.    This Court has diversity subject-matter jurisdiction.

Subject-matter jurisdiction is proper in this Court under 28 U.S.C. § 1332(a). The alleged amount in controversy exceeds $75,000, exclusive of interest and costs, and the controversy is between citizens of different states.

### A.    The properly joined parties are completely diverse and the fraudulently joined defendants' citizenship must be ignored.

At the time of removal, Plaintiffs were citizens of Kentucky, Virginia, Tennessee, Ohio, Georgia, and West Virginia.[96] All Respirator Defendants are citizens of states different than these. And the citizenship of the Supplier Defendants must be ignored because they are fraudulently joined.

---

[96]  *See* Complaint (attached as part of the state court record, Exhibit 1) at ¶ 2 and subparagraphs.

### i. The Respirator Defendants are diverse.

The Complaint sets out the citizenship of the Respirator Defendants.[97] 3M is a publicly-held company formed under the laws of Delaware whose principal place of business is in Minnesota. Accordingly, 3M is a citizen of Delaware and Minnesota.[98]

Mine Safety Appliances Company was formed under the laws of Pennsylvania and had a principal place of business in Pennsylvania. Mine Safety Appliances Company merged with Mine Safety Appliances Company, LLC, the surviving successor to the merger. Mine Safety Appliances Company, LLC is a limited liability company formed under the laws of Pennsylvania and all its members are citizens of Pennsylvania. Accordingly, Mine Safety Appliances Company, LLC, the surviving successor by merger with Mine Safety Appliances Company, is a citizen of Pennsylvania.

American Optical Corporation is a corporation formed under the laws of Delaware whose principal place of business is Connecticut. Accordingly, American Optical Corporation is a citizen of Delaware and Connecticut.

Cabot CSC Corporation is a corporation formed under the laws of Delaware whose principal place of business is in Massachusetts. Accordingly, Cabot CSC Corporation is a citizen of Delaware and Massachusetts.

Cabot Corporation is a corporation formed under the laws of Delaware whose principal place of business is in Massachusetts. Accordingly, Cabot Corporation is a citizen of Delaware and Massachusetts.

---

[97] Complaint (attached as part of the state court record, Exhibit 1) at ¶¶ 3-11.

[98] *See Hertz Corp. v. Friend*, 559 U.S. 77 (2010).

Aearo Technologies, LLC is a limited liability company formed under the laws of Delaware whose principal place of business is in Minnesota and all its members are citizens of Minnesota. Accordingly, Aearo Technologies, LLC is a citizen of Minnesota.[99]

Aearo LLC is a limited liability company formed under the laws of Delaware whose principal place of business is in Indiana and all its members are citizens of Minnesota. Accordingly, Aearo LLC is a citizen of Minnesota.

Accordingly, all Respirator Defendants are diverse from all Plaintiffs.

### ii. The Supplier Defendants are fraudulently joined. Each of them is a "Middleman," immune from liability under Kentucky law.

The Supplier Defendants—Mine Service Company, Inc., Network Supply, Regina Mine Supply, Inc., Carbon Mine Supply, LLC, M & M Mine Supply, Inc., and Kentucky Mine Supply Company—are all allegedly citizens of Kentucky.[100] But they have been fraudulently joined, and their citizenship must be ignored.

"Fraudulent joinder is a judicially created doctrine that provides an exception to the requirement of complete diversity."[101] "A defendant is fraudulently joined if it is clear that there can be no recovery under the law of the state on the cause alleged or on

---

[99]   *See Homfeld II, L.L.C. v. Comair Holdings, Inc.*, 53 F. App'x 731 (6th Cir. 2002).

[100]   Complaint (attached as part of the state court record, Exhibit 1) at ¶¶ 12-17.

[101]   *Casias v. Wal-Mart Stores, Inc.*, 695 F.3d 428, 432 (6th Cir. 2012) (internal quotation marks and citation omitted).

27

the facts in view of the law."[102] "The relevant inquiry is whether there is a colorable basis for predicting that a plaintiff may recover against a defendant."[103]

The court may, "[a]s appropriate," "pierce the pleading and consider summary judgment evidence."[104] "The court may look to material outside the pleadings for the limited purpose of determining whether there are undisputed facts that negate the claim."[105]

The Complaint asserts that the Supplier Defendants supplied the following products manufactured by the Respirator Defendants: MSA Dustfoe 66, MSA Dustfoe 88, 3M 8710, 3M 8715, 3M 8210, AO 2090, and AO 2090N.[106]

Under Kentucky law, a "middleman" (product supplier) is immune from liability "arising solely from the distribution or sale of [a] product" unless the plaintiff proves the middleman "breached an express warranty or knew or should have known" when the product was sold or distributed that the product was "in a defective condition, unreasonably dangerous to the user or consumer."[107] "A plaintiff must allege specific or special knowledge of dangerousness to avoid the middleman statute's protections."[108]

---

[102] *Id.* at 432-33 (alteration, internal quotation marks, and citation omitted).

[103] *Id.* at 433 (alteration, internal quotation marks, and citation omitted).

[104] *Id.* (internal quotation marks and citation omitted).

[105] *Id.* (internal quotation marks and citation omitted); *see, e.g.*, *Cline v. Dart Transit Co.*, 804 F. App'x 307, 311-12 (6th Cir. 2020) (concluding plaintiffs failed to show any record evidence established element necessary for colorable claim).

[106] Complaint (attached as part of the state court record, Exhibit 1) at ¶¶ 18, 20.

[107] Ky. Rev. Stat. § 411.340.

[108] *Conrad v. Sherwin Williams Co.*, No. CIV.A. 12−237−JBC, 2012 WL 5332494, at *2 (E.D.Ky. Oct. 29, 2012 (cleaned up).

4862-9853-5424, v. 1

The Complaint does not bring a claim for breach of express warranty against the Supplier Defendants. Instead, it asserts that the Supplier Defendants are liable because they knew or reasonably should have known that the respirators they distributed were defective.[109] But the Complaint has not stated a colorable claim against the Supplier Defendants.

> **1. Plaintiffs plead that the Respirator Defendants misled everyone; accepting their theory as true, the Supplier Defendants had no reason to know of any product defects.**

Critically, Plaintiffs allege that the Respirator Defendants "made false material representations of [their] products' safety and express warranties in sales literature, advertisements and sales promotional communications;" "unjustifiably marketed and advertised the respirator products to be effective against harmful respirable-sized pneumoconiosis producing dust as would be found in coal mines;" and "concealed and failed to disclose to . . . distributors . . . information which demonstrated the limitations and failures of their safety products."[110] In the story Plaintiffs tell, then, the Respirator Defendants didn't just fool the government, but also the Supplier Defendants.

Plaintiffs then assert that these misrepresentations deceived "the general public at large, including, but not limited to, the Plaintiffs and their employers" regarding "the safety and efficacy of [the] respiratory protection products."[111] According to Plaintiffs, the Respirator Defendants "had superior knowledge of the certification irregularities" of

---

[109] Complaint (attached as part of the state court record, Exhibit 1), Counts I and II.

[110] *Id.* at ¶¶ 28, 38-39.

[111] *Id.* at ¶ 40.

their respirators.[112] As discussed earlier, Plaintiffs contend that the Respirator Defendants deceived even federal agencies into providing "governmental approval" of their products.[113]

It defies reason to expect that the Supplier Defendants had a legal "duty" to rise above the Respirator Defendants' alleged transcending fraud—fraud supposedly capable of deceiving even sophisticated and knowledgeable federal agencies responsible for administering and enforcing highly technical federal regulations.[114] Whether the Supplier Defendants had such a legal duty is a question of law.[115]

And the answer to this question of law is obvious. Plaintiffs would have the Court gut the Kentucky Middleman Statute to impose such a duty. On Plaintiffs' understanding of the Middleman Statute, a Supplier would have to (1) employ an army of industrial hygienists to review thousands of pages of technical and scientific data found in any relevant publication and report on it to its customers; and (2) obtain legal counsel to compare that data with federal regulations, and check behind federal agencies', like NIOSH's, approval of such products. In other words, Plaintiffs' assertion of the Supplier Defendants' legal duty is tantamount to a failsafe on fraud upon the federal government and the public at large. That is not reasonable. That is not ordinary care for a supplier under Kentucky law.[116] And this Court has held that it is reasonable

---

[112] *Id*. at ¶ 41.

[113] *Id*. at ¶ 28.

[114] *Id*.

[115] *Johnson v. Wal-Mart Stores E., LP*, 169 F. Supp. 3d 700, 703 (E.D. Ky. 2016).

[116] *Neblett v. Bros.*, 325 F. Supp. 3d 797, 810 (E.D. Ky. 2018).

for a supplier to depend upon national certifications, especially when the supplier has no role in the product's testing or certification process.[117]

### 2. Plaintiffs' citations to regulations and publications do not support the Supplier Defendants' actual or constructive knowledge necessary to defeat Middleman immunity.

Plaintiffs list eight publications in their Complaint, published over the course of four decades, which they allege the Supplier Defendants should have read.[118] According to Plaintiffs, through deductive reasoning, the Supplier Defendants could have learned from the literature that certain respirators—not specifically identified in the literature—are defective and unreasonably dangerous.[119]

Even if the Supplier Defendants had a duty to read and understand the universe of scientific literature published over the course of decades related to each category of product they supplied, the Complaint's listed publications would not have conveyed information to the Supplier Defendants regarding the specific respirators listed in the Complaint and their alleged defects.

3M is attaching the cited portions of those publications as a composite exhibit.[120] The publications contain general scientific knowledge; none communicates that any

---

[117] *Taylor v. Southwire Tools & Equip.*, 130 F. Supp. 3d 1017, 1023-1024 (E.D. Ky. 2015).

[118] Complaint (attached as part of the state court record, Exhibit 1) at ¶ 48.

[119] Id.

[120] Exhibit 7 (Composite of Scientific Literature). The last reference, to a 1974 "Guide to Respiratory Protection" is ambiguous. 3M is unable to include the document in this composite exhibit because it is unclear what document it is. The pages of *Patty's Industrial Hygiene and Toxicology* referenced in the Complaint are also not

31

particular respirator is defective or unreasonably dangerous, or that a class of respirators have shared defects. Plaintiffs' allegation that the Supplier Defendants possessed knowledge of product defects from reading these publications is fatuous. It bears mentioning that in the 2000s, the Occupational Safety and Health Administration (OSHA), possessing far more knowledge and retrospective perspective than the Supplier Defendants in past decades, conducted a giant retrospective study of filtering facepiece respirators, and considered the various arguments and allegations presented by many Plaintiffs' experts. That study found that these products, including 3M's, achieve the level of protection for which they were designed and can be reliably fit checked, expressly rejecting the litigation-driven theories presented.[121] It would make a mockery of the Middleman Statute to conclude that the Supplier Defendants should have read eight general publications and reached a conclusion different than OSHA.

### 3.  Plaintiffs' Counsel's conduct in other cases reveals no intention to defeat Middleman immunity.

Truthfully, Plaintiffs' counsel has no intention of proceeding against the Supplier Defendants, and has joined them solely to defeat diversity. A pattern and practice of failing to engage in even trivial discovery against the nondiverse defendants, followed by their routine dismissal shortly before trial, has emerged in virtually all matters where these Supplier Defendants are named alongside the Respirator Defendants.[122] 3M

---

included in this composite exhibit because 3M cannot locate the pages. 3M will supplement this exhibit once it locates the referenced pages.

[121] Assigned Protection Factors, 71 Fed. Reg. 50122, 50163-64 (Aug. 24, 2006).

[122] *Kent v. Bank of Am., N.A.*, Civ. No. 11-2315, 2012 WL 3582759, at *16 (D. Minn. 2012) (finding that plaintiff's counsel's pattern and practice demonstrated that nondiverse defendants had been joined solely to defeat jurisdiction); *In re Diet*

attaches here dockets which are representative of the pattern and practice from three recent Eastern Kentucky cases in which Plaintiffs' counsel has appeared.[123] The dockets reveal no written discovery propounded on any Supplier Defendant, and no notices of deposition served on any witness associated with a Supplier Defendant. Plaintiffs have no intention of proving *any* case against the Supplier Defendants, much less overcoming the high hurdle of Middleman immunity.

In a similar case removed three years ago involving other plaintiffs' counsel, Judge Caldwell of the Eastern District noted this "troubling" pattern: plaintiffs failing to conduct discovery on non-diverse defendants and dismissing them when their removal-thwarting assistance was no longer required.[124] Judge Caldwell referred to the pattern as enough to "raise an eyebrow here as to what's happening with these suppliers."[125] As the years have worn on, the still-growing pattern should do even more than raise an eyebrow; it should persuade this Court that the Supplier Defendants are fraudulently joined.

To further illustrate Plaintiffs' lack of intent to recover from the Supplier Defendants, three of the Supplier Defendants were administratively dissolved decades ago: Network Supply (1993); Regina Mine Supply, Inc. (1996); and Carbon Mine Supply,

---

*Drugs*, 220 F. Supp. 2d 414, 424 (E.D. Pa. 2002) (finding fraudulent joinder where plaintiffs in mass pharmaceutical litigation had exhibited a pattern and practice of voluntarily dismissing nondiverse pharmacies after one-year time limit for removal had passed).

[123]  Exhibit 8 (Sample Dockets).

[124] Exhibit 9 (Tr. in *Williams v. 3M Co*.; No. 7:18-cv-0063 (E.D. Ky)).

[125] *Id*. at 31-32.

LLC (2013).[126] The Complaint acknowledges this for two of the defendants, describing them as "former" corporations.[127] These administratively dissolved corporations continue to exist only for purposes of winding up and liquidation.[128] "Generally, for the purpose of being sued, a corporation is deemed to exist until its debts are paid."[129] Plaintiffs do not and cannot expect to recover from administratively dissolved corporations. They are joined solely in an attempt to defeat diversity. The Court must ignore the diversity of the fraudulently joined Supplier Defendants.

### B.     The amount in controversy exceeds $75,000.

This "notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold. Evidence establishing the amount is required . . . only when the plaintiff contests, or the court questions, the . . .

---

[126] Exhibit 10 (Ky. Sec'y of State Business Entity Search Record for Network Supply, Inc.), *available at*
https://web.sos.ky.gov/ftshow/(S(en0uh2smw0ghymmxu3fkfrcq))/default.aspx?path=ftsearch&id=0280379&ct=09&cs=99999&ce=ZCwhgvtXHNZENfX1YQsUhtr78pL9KGS%2fJ2t55PjDaQdmzJxvqviiQ26E30%2bt8H4%2b (last accessed Oct. 22, 2021); Exhibit 11 (Ky. Sec'y of State Business Entity Search Record for Regina Mine Supply, Inc.), *available at*
https://web.sos.ky.gov/ftshow/(S(c1farhs20hw3buczgsszemtz))/default.aspx?path=ftsearch&id=0158429&ct=09&cs=99999&ce=dvxK83peYV2Q34K9ImmFHdBhDwQLDgsa4jcO9q9fXYww%2ffbTnQhnrggaFbCsAQxi (last accessed Oct. 22, 2021); Exhibit 12 (Ky. Sec'y of State Business Entity Search Record for Carbon Mine Supply, LLC), *available at*
https://web.sos.ky.gov/ftshow/(S(hsskriaqia3dgbtwzjuebwcr))/default.aspx?path=ftsearch&id=0602985&ct=06&cs=99998&ce=UD6H5u8xpiJ7TTwhCmEX%2b%2f%2bOsywxCrxlYo2AJoAauBvLrGpc7%2fU3bHtsZIa0HT3m (last accessed Oct. 22, 2021).

[127] Complaint (attached as part of the state court record, Exhibit 1) at ¶¶ 14-15.

[128] KRS § 14A.7-020(3).

[129] *Bear, Inc. v. Smith*, 303 S.W.3d 137, 145 (Ky. App. 2010).

34

allegation."[130] It is apparent from the Complaint that the amount in controversy plausibly exceeds $75,000. Each Plaintiff is plainly capable of satisfying this jurisdictional threshold on his or her own.

In examining the amount in controversy, the Court can consider the categories and nature of the damages asserted in the Complaint. The more numerous and serious the categories, the more plausible it becomes that the amount in controversy is large enough to confer jurisdiction.[131] And the Court can consider punitive damages: when such damages are pleaded, and where "state law at least arguably permits the type of damages claimed," the Court can assume a single-digit punitive damages multiplier and include that multiplier in the jurisdictional math.[132] Kentucky law permits punitive damages.[133]

The categories of damages alleged are numerous and significant. Plaintiffs claim compensatory damages for past and future medical expenses, past and future lost wages and earning capacity, past and future pain and suffering, loss of consortium, and physical disfigurement.[134]  Plaintiffs seek punitive damages.[135] Punitive damages are

---

[130] *Dart*, 574 U.S. at 89.

[131] *E.g.*, *Hayes*, 266 F.3d at 573; *Luckett*, 171 F.3d at 298.

[132] *Kovacs*, 406 F.3d at 397; s*ee also Heyman*, 781 F. App'x at 471-472; *Hollon*, 417 F. Supp. 2d at 853.

[133] K.R.S. § 411.184.

[134] Complaint (attached as part of the state court record, Exhibit 1) at Prayer for Relief ¶¶ 1-2.

[135] *Id*. at Prayer for Relief ¶ 3.

included in the amount in controversy.[136] Assuming a very conservative 2:1 punitive damages ratio, the amount of compensatory damages in controversy need only be $25,000 to reach the overall threshold. Just one of the compensatory categories listed above can easily reach that in any personal injury case.

Finally, verdicts in similar respirator lawsuits with just one or two plaintiffs have consistently exceeded $75,000. For example, in *Couch v. MSA*, Knott Circuit Court, No. 10-CI-155, the jury awarded $8 million (including $4 million in compensatory damages) to a single plaintiff in a similar respirator lawsuit.[137] Another example is *Cox v. 3M* (Knox Circuit Court, No. 16-CI-0100) where the jury awarded $67.5 million ($62.5 in punitive damages) to two plaintiffs in a similar respirator lawsuit.[138] Given those previous outcomes, the amount in controversy far exceeds $75,000.

### IV.    3M has satisfied the technical requirements to remove the case.

This removal meets the technical requirements of timeliness, joinder, service, and notice.

Fewer than thirty days have elapsed since 3M received the Complaint.[139] Plaintiffs served the Complaint on 3M on October 5, 2021—just twenty days ago.

---

[136]  *Hayes v. Equitable Energy Res. Co.*, 266 F.3d 560, 572 (6th Cir. 2001).

[137]  WYMT, *Knott County man awarded 8 million dollar judgment in dust mask lawsuit*, https://www.wymt.com/content/news/Knott-County-man-awarded-8-million-dollar-judgment-in-dust-mask-lawsuit--370562261.html (last accessed Oct. 21, 2021).

[138]  Exhibit 13 (Judgment in *Cox v. 3M*).

[139]  28 U.S.C. § 1446(b)(2).

The joinder and consent of other defendants is not required in this case. CAFA cases "may be removed by any defendant without the consent of all defendants."[140] Nonetheless, 3M has obtained the consent of all properly served defendants, *i.e.*, the other Respirator Defendants.[141] As explained above, the Supplier Defendants are not properly joined, and their consent to removal is therefore unnecessary.[142]

The service and notice requirements are met. The state court record is attached as Exhibit 1 to this notice.[143] And 3M will file a written notice of this removal in the Circuit Court of Pike County, a copy of which is attached as Exhibit 14 to this notice. 3M will attach this notice as an exhibit to the state court filing and provide written notice of this removal to Plaintiffs.

* * *

3M gives notice that the above-styled action is removed from the Circuit Court of Pike County, Kentucky, to the United States District Court for the Eastern District of Kentucky, Southern Division at Pikeville. Plaintiffs are notified to proceed no further in state court.

## <u>CERTIFICATE</u>

This is to certify that , on October 25, 2021, there was served upon the Clerk of the Pike Circuit Court a copy of the Notice of Removal of this action, then pending in the

---

[140] 28 U.S.C. § 1453(b); *see also Bonin v. Sabine River Auth. of Louisiana*, 961 F.3d 381, 387 (5th Cir. 2020).

[141] 28 U.S.C. § 1446(b)(2).

[142] *Chambers v. HSBC Bank USA, N.A.*, 796 F.3d 560, 564 (6th Cir. 2015).

[143] 28 U.S.C. § 1446(a).

Pike Circuit Court, in which said action was designated as removed to the United States District Court for the Eastern District of Kentucky, Southern Division at Pikeville.

Respectfully submitted,

THOMPSON MILLER & SIMPSON PLC


*/s/ Byron N. Miller*
Byron N. Miller
Michael J. Bender
734 West Main Street, Suite 400
Louisville, KY 40202
Telephone: (502) 585-9900
Facsimile: (502) 585-9993
bmiller@tmslawplc.com
mbender@tmslawplc.com
mhess@tmslawplc.com
mhendricks@tmslawplc.com

And

Bryant J. Spann
Robert H. Akers
THOMAS COMBS & SPANN
300 Summers Street, Suite 1380
Charlestown, WV 25301
Telephone: (304) 414-1800
Facsimile: (304) 414-1801
BSpann@tcspllc.com
RAkers@tcspllc.com
JBrowne@tcspllc.com
LGibson@tcspllc.com
*Counsel for Defendant 3M Company*


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was electronically filed this 25th day of October 2021 through the operation of the Court's electronic filing system. Parties may access this filing through the Court's system. A true and correct copy of the foregoing was also mailed and / or served via electronic mail to the following:

4862-9853-5424, v. 1

| | |
|---|---|
| Glenn Martin Hammond<br>Glenn M. Hammond Law Office<br>5476 North Mayo Trail<br>P.O. Box 1109<br>Pikeville, KY 41501<br>gmhlaw@hotmail.com<br>erin@gmhlawoffice.com<br>*Counsel for Plaintiffs* | Michael B. Martin<br>Martin Walton Law Firm<br>699 S. Friendswood Drive, Suite 107<br>Houston, TX 77456-4580<br>mmartin@martinwaltonlaw.com<br>rhonda@martinwaltonlaw.com<br>*Counsel for Plaintiffs* |
| M. Trent Spurlock<br>Alice A. Jones<br>Dinsmore & Shohl, LLP<br>101 South Fifth Street, Suite 2500<br>Louisville, KY 40202<br>Trent.Spurlock@Dinsmore.com<br>Alice.Jones@Dinsmore.com<br>Brenda.Goodhue@Dinsmore.com<br>*Counsel for Defendant Mine Safety*<br>*Appliances Company, LLC* | Robert M. Connolly<br>Carol Dan Browning<br>Whitney Frazier Watt<br>Emily L. Startsman<br>Stites & Harbison, PLLC<br>400 West Market Street, Suite 1800<br>Louisville, KY 40202<br>rconnolly@stites.com<br>cbrowning@stites.com<br>wwatt@stites.com<br>estartsman@stites.com<br>*Counsel for Defendants American Optical*<br>*Corporation, Cabot CSC Corporation, Cabot*<br>*Corporation, Aearo Technologies, LLC and*<br>*Aearo, LLC* |
| Patrick W. Gault<br>Napier Gault Schupbach & Stevens PLC<br>730 West Main Street, Suite 400<br>Louisville, KY 40202<br>pgault@napiergaultlaw.com<br>abury@napiergaultlaw.com<br>*Counsel for Defendant Mine Service*<br>*Company, Inc. and Kentucky Mine Supply* | Mike Mullins<br>Registered Agent<br>Box 138, U.S. Route 460<br>Regina, KY 41559<br>*Regina Mine Supply* |
| Chauncey S.R. Curtz<br>Registered Agent<br>250 West Main Street, Suite 1400<br>Lexington, KY 40507<br>*Carbon Mine Supply, LLC* | James A. Moore<br>Registered Agent<br>3315 Collins Hwy.<br>Pikeville, KY 41501<br>*M & M Mine Supply Company, Inc.* |

/s/ Byron N. Miller
*Counsel for Defendant 3M Company*

4862-9853-5424, v. 1