**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE
CIVIL ACTION NO. 7:21-CV-82-REW-CJS**

*ELECTRONICALLY FILED*

**BRIAN ADAMS, et al.,**                                                                       **PLAINTIFFS**

**v.**

**3M COMPANY, et al.,**                                                                         **DEFENDANTS**

---

**PLAINTIFFS' BRIEF ON GENERAL PRINCIPLES OF KENTUCKY LAW REGARDING STATUTE OF LIMITATIONS AND THE DISCOVERY RULE**

---

**INTRODUCTION**

For decades, Defendants 3M Company, Mine Safety Appliances, and American Optical marketed their dust masks as safe and appropriate for use in the tough underground conditions in Kentucky coal mines. They did so despite their own internal awareness as early as 1976 that "[w]e now know that the 8710 is unacceptable in the underground mining area due to collapse and abuse from high heat and humidity." Petitioners' Joint Appeal Brief, *Hardy v. 3M Company*, No. 22-ICA-123, at 2 (Intermediate W. Va. Ct. App. Jan. 9, 2023). Defendants also knew that coal miners would never know the difference—something Defendant MSA called "unconscionable" in a 1994 white paper. *Id.*

The *Adams* and *Mounts* groups of plaintiffs ("**Plaintiffs**") are over 250 coal workers who developed black lung, their spouses, and, regrettably, their estates. Plaintiffs assert various claims against the Defendant dust mask manufacturers, generally alleging that the masks Defendants sold were knowingly unsuitable for use in mines and provided dangerously ineffective respiratory protection. Defendants now seek summary judgment based on the statute of limitations despite the

1

fact that almost certainly none of the Plaintiffs here had the scientific or engineering education and training necessary to evaluate the effectiveness of their masks' filtration of the sub-micron dust particles that, when inhaled into the lungs, can and did cause coal workers' pneumoconiosis to develop years after leaving the mines.

There is no question that the discovery rule applies to determine claim accrual in latent disease cases. Because each application of the discovery rule is necessarily dependent on the facts of each specific case, it is impossible to articulate any single one-size-fits-all rule under Kentucky law, making Defendants' request for summary judgment as to dozens of plaintiffs based on a broad-brush application of the rule improper. Indeed, that is why Kentucky courts applying Kentucky law routinely defer the ultimate resolution of the discovery rule to juries.

To assist the Court in evaluating Defendants' forthcoming motions, Plaintiffs submit the following ten (10) General Principles of Kentucky Law relevant to applying the discovery rule in a dust mask case:

(1)  The discovery rule applies to latent disease cases like coal workers' pneumoconiosis. *See 3M Co. v. Engle*, 328 S.W.3d 184, 189 (Ky. 2010).

(2)  The Kentucky discovery rule requires knowledge of both legal injury and the wrongdoer who caused it. *See Wiseman v. Alliant Hosps., Inc.*, 37 S.W.3d 709, 712 (Ky. 2000).

(3)  Knowledge of "injury" means more than just knowledge of "harm." *See Id.* at 712.

(4)  Knowledge of the cause and wrongdoer requires more than just suspicion of a merely possible cause. *See Stallins v. Hinton*, 2015 WL 5316700, at *5 (Ky. Civ. App. 2015).

(5)  Applying the discovery rule in the context of a latent disease case like coal workers' pneumoconiosis necessarily requires consideration of the patient's perspective and recognition of all potential causes of the diseases. *See Elam v. Menzies*, 594 F.3d 463, 468 (6th Cir. 2010); *Imes v. Touma*, 784 F.2d 756 (6th Cir. 1986).

2

(6) General public awareness is not sufficient to start the limitations period as a matter of law. *See Elam*, 594 F.3d at 466.

(7) The doctrines of fraudulent concealment and equitable estoppel may prevent limitations from starting or applying. *See Williams v. Hawkins*, 594 S.W.3d 189, 196 (Ky. 2020).

(8) A black lung diagnosis is not enough, alone, to start the statute of limitations. *See Johnson v. Sandoz Pharms. Corp.*, 24 F. App'x 533, 538 (6th Cir. 2001); *Van Landingham v. Georgia Pac. Corp.*, No. 2007-CA-002601-MR, 2009 WL 2475258, at *3 (Ky. Ct. App. Aug. 14, 2009); *Cutter v. Ethicon, Inc.*, No. 20-6040, 2021 WL 3754245 (6th Cir. Aug. 25, 2021).

(9) Resolving the discovery rule in a particular case is almost always a question of fact for the jury. *See Gilmore v. Davis*, 185 F. App'x 476, 483 (6th Cir. 2006); *3M Co. v. Engle*, 328 S.W.3d 184, 189 (Ky. 2010); *Lipsteuer v. CSX Transp., Inc.*, 37 S.W.3d 732, 737 (Ky. 2000).

(10) *3M Co. v. Engle* is the best predictor of how the Kentucky Supreme Court would apply the discovery rule in a dust mask case. *See 3M Co. v. Engle*, 328 S.W.3d 184 (Ky. 2010).

### 1. The Discovery Rule Applies to Latent-Disease Cases.

"[C]ourts applying Kentucky law have repeatedly articulated the Kentucky rule, at least with respect to latent injuries caused by exposure to a harmful substance, as ***requiring both*** discovery of injury ***and*** a reasonable opportunity to discover the causal relationship before the claim accrues." *Johnson*, 24 F. App'x at 536. Accordingly, there should be no dispute that the discovery rule applies to cases identifying coal workers' pneumoconiosis as the alleged injury. *See, e.g.*, *Engle*, 328 S.W.3d at 189, *as corrected* (Dec. 27, 2010) (noting that the discovery rule applies to CWP cases in a dust mask case); *Louisville Tr. Co. v. Johns-Manville Prods. Corp.*, 580 S.W.2d 497, 500 (Ky. 1979) ("[W]hen an injury does not manifest itself immediately the cause of action should accrue not when the injury was initially inflicted . . . .").

### 2. The Kentucky discovery rule requires knowledge of both legal injury <u>and</u> who caused it.

The Kentucky discovery rule contains two (2) elements that must be satisfied before the statute of limitations will begin to run. The plaintiff must know: "(1) he has been wronged; and,

3

(2) by whom the wrong has been committed." *Wiseman*, 37 S.W.3d at 712; *accord Elam*, 594 F.3d at 466; *Bray v. Husted*, 11 F. Supp. 3d 854, 855-56 (E.D. Ky. 2014); *Louisville Tr. Co.*, 580 S.W.2d at 501; *R.T. Vanderbilt Co. v. Franklin*, 290 S.W.3d 654, 659 (Ky. Ct. App. 2009). Importantly, the statute of limitations does not begin to run until both prongs are met. *Stallins*, 2015 WL 5316700, at *3.

### 3. Knowledge of an "injury" requires more than just knowledge of "harm."

The difference between harm and legal injury is significant in Kentucky. In *Wiseman*, the Kentucky Supreme Court looked to the Restatement (Second) of Torts to explain the difference. Section 7 defines "harm" as "the existence or loss or detriment in fact of any kind to a person resulting from any cause." 37 S.W.3d at 712 (quoting RST § 7). "Injury" is different and is defined as "the invasion of any legally protected interest of another." 37 S.W.3d at 712 (quoting RST § 7).

*Wiseman* was a medical malpractice case, and the *Wiseman* Court used that context to provide an example: "Harm in the context of medical malpractice might be the loss of health following medical treatment," and "could result from a successful operation where a communicated, calculated risk simply turns out poorly for the patient, although the medical treatment met the highest medical standards." 37 S.W.3d at 712. "Injury," however, "'refers to the actual wrongdoing, *or the malpractice itself.*'" *Id.* (emphasis added) (internal quotations omitted). *Wiseman's* teachings "apply equally in the products liability context." *Cutter v. Ethicon,* 2021 WL 3754245, *5.

The key point is that in Kentucky, knowledge of the legal "injury" requires more than just knowledge of the harm—it requires knowledge that there has been some wrongdoing involved in relation to the disease; *i.e.* that there has been an "invasion" of the person's legally protected interest. *See id*. As applied here, the statute of limitations does not begin to run merely because a

4

person is diagnosed with a latent disease like coal workers' pneumoconiosis. The disease simply constitutes the "harm," just as the "loss of health following medical treatment" is the harm in a medical malpractice case. *See id*.

### 4. "Knowledge" of the wrongdoer requires more than just a "suspicion" of a possible cause.

Both elements of the discovery rule require knowledge on the part of the plaintiff. As the case law makes clear, this requires real knowledge—not just a "suspicion" or a subjective "belief." Even the fact that the plaintiff "may have suspected that something was wrong . . . in and of itself [is] insufficient to accrue a cause of action." *Stallins*, 2015 WL 5316700, at *5; *see also Wiseman*, 37 S.W.3d at 713 (fact question over when the statute began to run where the plaintiff experienced chronic pain beginning soon after surgery and suspected that something had gone wrong during the earlier surgery, but it was not until years later that a doctor found an instrument used during that surgery buried under the plaintiff's skin); *Bray*, 11 F. Supp. 3d at 858–59 (fact question over when the statute began to run where the plaintiff "experienced immense harm following her surgery" and believed that a surgeon's malpractice caused that harm but a second physician later said that he would need to perform exploratory surgery to confirm the cause of the harm).

In light of the difference between knowledge and mere suspicion, it makes sense that Kentucky courts have denied summary judgment on limitations based on the diagnosis of an illness merely because it is *possible* to link that diagnosis to the defendant. *See, e.g.*, *Johnson*, 24 F. App'x at 538 (denying summary judgment when plaintiff suffered a stroke shortly after taking a medication whose package insert disclosed past reports of strokes); *Van Landigham*, 2009 WL 2475258, at *3 (denying summary judgment when plaintiff, a retired asbestos tile worker, was diagnosed with pleural plaques even while acknowledging that asbestos is a common cause of pleural plaques); *Cutter*, 2021 WL 3754245, *1 at (denying summary judgment even though a

5

physician told the plaintiff more than a year before filing suit that the defendant's pelvic mesh was a "possible" cause of the plaintiff's health problems).

5. **Evaluating the discovery rule in a coal workers' pneumoconiosis case requires consideration of the miner's perspective and all potential causes of the disease.**

Determining when a plaintiff knew or reasonably should have known of his injury (as opposed to harm) and the actual cause of that injury (as opposed to mere suspicion of a possible cause) is an extremely fact-intensive inquiry that requires consideration of multiple factors.

To begin, "a court must give special consideration to the patient's perspective." *Cutter*, 2021 WL 3754245, at *5. That necessarily includes the plaintiff's level of education and training. *See id.* at *7 (holding that factual dispute existed over when the statute started to run under the discovery rule because, *inter alia*, the plaintiff "did not graduate from high school . . . she was not a doctor and had no special medical knowledge").

Although each plaintiff will be different, it is safe to say that very few plaintiffs have college experience, much less a college degree. The majority did not finish high school. None are industrial hygienists or have medical training. Put simply, it is exceedingly unlikely that any plaintiff in the *Adams* or *Mounts* cases had the scientific knowledge necessary to identify or evaluate the causal relationship between their dust masks and their disease.

The court must also consider whether the plaintiff had a reasonable basis to believe that he had been harmed through no fault of the defendant. *See, e.g.*, *Elam*, 594 F.3d at 468 (applying Kentucky law, denying summary judgment on statute of limitations when plaintiff initially had reason to believe that his injury was not attributable to defendant); *Cutter*, 2021 WL 3754245, at *6; *Wiseman*, 37 S.W.3d at 712. That implicates both other possible causes and information available to the plaintiff regarding the defendant's conduct.

6

From the perspective of a worker who has just been diagnosed with lung disease, the list of potential causes is long. A miner might reasonably wonder, just as his father and grandfather did, whether his disease was simply the natural consequence of a career spent in a dirty, dusty, and dangerous environment. He might very reasonably assume that even if all procedures and policies were followed, and even if his equipment performed satisfactorily, some small number of miners could nevertheless still be expected to get sick, and he just had the bad luck of being one of them. *C.f. Imes v. Touma*, 784 F.2d 756 (6th Cir.1986) (applying Kentucky law, holding that whether plaintiff should have known that the harm was a result of negligence was a fact question not properly decided on summary judgment because the harm could happen "even when everything is done correctly").

Of course, not all policies and procedures are in fact followed exactly as they should be, and the miner could reasonably wonder whether he worked in an exceptionally dusty mine, or a mine with inadequate ventilation measures in place.

Alternatively, he might very well wonder if he, himself, was to blame. If he didn't wear his mask 100% of the time, all day, every day, he could very reasonably wonder if the few times he hadn't worn his mask (or had removed it for a drink or to scratch an itch) were enough to expose him to enough dust to cause his disease. If the miner had facial hair at any point during his career, he may initially suspect that it interfered with his protective equipment enough to expose him to too much dust. Or even if he maintained a clean-shaven face throughout his career, did he nevertheless fail to properly fit his mask to a perfect seal on occasion?  If a miner was ever a smoker, he might very well blame his lung disease on cigarettes—a possible explanation that is even more likely in direct proportion to the length of his smoking history. These are all questions and considerations that very naturally would occur to any miner diagnosed with a lung disease.

Indeed, Defendants strenuously argue that there are "numerous" other possible causes of coal workers' pneumoconiosis, including smoking and inhaled coal dust from other sources, improper mask usage, or unsafe mining environments. The very fact that Defendants assert that any of these causes could be the "true" cause of a Plaintiff's black lung defeats their argument that a Plaintiff "reasonably should have known" more than a year prior to suit that their dust masks were faulty. It simply defies logic that Defendants argue as to some Plaintiffs that the masks operated perfectly to specification and yet in others argue that—<u>as a matter of law</u>—a different Plaintiff should have <u>known</u> that the dust masks were to blame.

Conversely, the Plaintiff's experience with the Defendant's mask is also relevant to what the Plaintiff knew or reasonably believed. When coupled with Defendants' marketing and consistent public statements touting their masks as safe, and capable of protecting a user up to 10 times the legal exposure limit, a Plaintiff who never tasted or smelled dust when wearing the mask; thought his seal on the mask was good; and never saw dust on the inside of the mask would not reasonably suspect otherwise.[1]

Ultimately, the court must consider every relevant factor and determine whether "the surrounding circumstances made the alleged causal relationship less than obvious to a lay person." *Johnson*, 24 F. App'x at 538 (applying Kentucky law). The key question, specifically, is whether after acquiring knowledge of the injury, the plaintiff had the background necessary to evaluate the injury, identify its possible causes, and determine that *this* defendant's actions were a substantial

---

[1] The masks which are the subject of this litigation were categorized as a class of respirators providing a protection factor of 10. *See*, American National Standards Institute, at 6 (Table 1) (1992).

8

factor in causing the injury.[2] That can be an incredibly difficult thing to do, especially so in latent disease cases. Coal workers' pneumoconiosis is no different.

6. **General public awareness is not sufficient to start the limitations period as a matter of law.**

In other cases, dust mask defendants have pointed to attorney advertising and media reports on other litigation as supposedly evidence of a general public awareness of dusk mask litigation and, consequently, dispositively proving that a particular plaintiff should have known that dust masks were defective. While the various ways that dust mask litigation appears in public fora may be relevant to determining whether or when a Plaintiff had knowledge that his defective dust mask caused an injury, none of them, either individually or collectively, establish <u>as a matter of law</u> that summary judgment is appropriate. The problem with Defendants' reliance on various public pronouncements is two-fold.

First, unless there is evidence tying a particular statement to a specific Plaintiff, then it simply cannot establish that specific Plaintiff's awareness that dust makes played a causal role in his disease. General awareness among some members of the public simply cannot, as a matter of law, act as knowledge imputed to a specific plaintiff sufficient to start limitations unless there is some evidence tying a media report, advertisement, or the like to the plaintiff himself. *See Elam*, 594 F.3d at 466 ("[I]t simply is not clear when [the plaintiff] actually saw the advertisements. Drawing inferences in favor of [the plaintiff], he did not see the advertisements before [one year before filing suit], and they cannot have triggered the statute of limitations early enough to time-bar his suit.").

---

[2] It is worth noting that Defendants' proposed standard that limitations begins to run as soon as a potential plaintiff knows the defendant is merely a *possible* cause of his injuries is inconsistent with Kentucky law of causation, which requires that wrongdoing be a "substantial factor" in causing the injury. *See CertainTeed Corp. v. Dexter*, 330 S.W.3d 64 (Ky. 2010).

9

Second, even evidence that a Plaintiff was aware of a particular public statement is not enough to start the limitations clock as a matter of law. At most, it merely adds to the factual dispute in the limitations analysis to be weighed and resolved by a jury.

Take TV commercials, for example. Defendants have argued in other cases that television commercials, particularly lawyer advertisements for potential dust masks clients, put a plaintiff on notice of his claim for limitations purposes. The Sixth Circuit has rejected the reasoning underlying that argument in similar circumstances. In *Elam*, the district court granted summary judgment on statute of limitations grounds partly because lawyers were advertising for cases similar to the plaintiff's more than a year before the plaintiff filed suit. *See Elam*, 594 F.3d at 466. The Sixth Circuit reversed, noting that "television commercials—while potentially informative—cannot be trusted" because "the information contained therein seeks to persuade the viewer to purchase a product or service." *Id.* at 470; *see also id.* ("We hesitate to find that the viewing of a television commercial was sufficient to trigger any discovery rule.").

7. **The doctrines of fraudulent concealment and equitable estoppel may prevent limitations from starting or applying.**

A statute of limitations defense is not focused exclusively on the plaintiff. Under Kentucky law, a party who fraudulently conceals an injury or its role in causing the injury may be equitably estopped from relying on the defense of limitations. *Hawkins*, 594 S.W.3d at 196 (quoting *Munday v. Mayfair Diagnostic Lab.*, 831 S.W.2d 912, 914 (Ky. 1992)). The doctrine of equitable estoppel in Kentucky considers the conduct of both the party seeking estoppel and the party to be estopped.

The essential elements with respect to the party to be estopped (Defendants) are:

(1) conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert;

  (2)  the intention, or at least the expectation, that such conduct shall be acted upon by, or influence, the other party or other persons; and

  (3)  knowledge, actual or constructive, of the real facts.

*See Hawkins*, 594 S.W.3d at 196.

As to the party seeking estoppel (Plaintiffs), the essential elements are:

  (1) A lack of knowledge and of the means of knowledge of the truth as to the facts in question;

  (2) reliance, in good faith, upon the conduct or statements of the party to be estopped; and

  (3) action or inaction based thereon of such a character as to change the position or status of the party claiming the estoppel, to his injury, detriment, or prejudice.

*Id.* Evidence from other dust mask cases indicates that each element is satisfied as to each of the Defendants. Despite 3M's internal awareness that the 8710 dust mask allowed excessive penetration of those particles under conditions like those found in coal mines, and despite its awareness no later than 1976 that "[w]e now know that the 8710 is unacceptable in the underground mining area due to collapse and abuse from high heat and humidity," 3M nevertheless sold—and continued to sell—those masks for use in mines for another 20 years until 1998. Similarly, there is no indication that the 3M 8210 performs any better in an underground mine than its predecessor the 8710. 3M admits that "the size, shape and construction of the 3M 8710 is almost identical to that of the 3M 8210." *See, Blackburn v. 3M Co.*, C.A. 7:23-cv-00075-REW-CJS; ECF # 81-1 at 6.

  Defendants AO and MSA similarly knew that their dust masks would not adequately protect underground miners but, like 3M, continued to market their products to miners and mine companies just the same. Both manufacturers, for example, were aware that the electrostatic filters used in their respirators degraded too quickly in a mining environment to provide sufficient protection against the sub-micron particles that cause lung disease.

11

Because those sub-micron particles can't be seen, tasted, smelled, or detected by human senses in any way, coal miners (and the mine operators, purchasing officers, and safety personnel they relied on) had no way of knowing that their masks were failing them. MSA recognized this in an internal white paper in 1994 that contained this naked admission:

> "[W]hat's unconscionable is that the user, who is depending on the electrostatic filter for respiratory protection, has no indicator that the electrostatic filter is losing its efficiency—there is no breakthrough or warning properties that the user can detect, taste, or smell; **only his uncontrollable, unwitting, unwanted exposure to the hazard**."

Despite its acknowledgment that users were dependent on MSA's product, it continued producing, marketing, and selling those respirators for mine use for almost a decade after the white paper was written.

The Mine Safety Health Administration (MSHA) ultimately agreed with this conclusion in publishing its Final Rule on Respiratory Protection in 2024. In the Final Rule, MSHA disqualified N95 respirators, which include the 3M, AO and MSA brands at issue here, from use in an underground mine. MSHA declared: "the 95 series particulate respirators do not offer as high a degree of protection as the 100 series and are less likely to provide the expected level of protection due to concerns about poor fit and vulnerability to mishandling such as folding or crushing." MSHA Final Rule 89 Fed. Reg. 28218, 28294 (April 18, 2024), Lowering Miners Exposure to Respirable Crystaline Silica and Improving Respiratory Protection.

In the face of decades of Defendants' marketing their masks as proper protection in mines and the industry's reasonable acceptance of those representations, it should not be surprising that, once diagnosed with lung disease, miners and their families would only slowly come to the

12

realization that their masks—worn for years without any obvious indication of their failure to the user—were the culprits.[3]

**8. A black lung diagnosis is not enough, alone, to start the statute of limitations.**

The general principles listed above make clear that a diagnosis of coal workers' pneumoconiosis is not enough, standing alone, to satisfy the elements of the discovery rule and start limitations running for three reasons.

First, Defendants' argument requires ignoring the other possible reasons a miner could have developed pneumoconiosis. Essentially, Defendants' logic is that a miner wears a dust mask to prevent inhaling the microscopic dust particles that cause the disease. If that miner then is nevertheless diagnosed with black lung, then (as Defendants argue) the miner should immediately know that the dust mask did not do what it was supposed to do and, therefore, the miner is on notice of his claim.

Defendants' argument is premised on ignoring the multiple other possible causes a miner might suspect of causing his pneumoconiosis, which is contrary to what Kentucky cases require. *See supra,* General Principle No. 3. As Defendants have argued elsewhere, and will no doubt argue again later in these cases, there are a number of possible ways a miner can get the disease other than because of defective dust masks, some involving negligence and some not.[4] Knowledge of the harm, on its own, is simply not enough in this context to automatically assume knowledge of wrongdoing and the wrongdoer.

---

[3] MSHA did not reach its conclusion as to the inadequacy of these N95 respirators in underground mines until 2024.

[4] *See supra*, General Principle No. 5 (discussing other potential causes like smoking, improper fit, breathing dust when not wearing a mask, overly dusty or improperly ventilated mines, or simple bad luck).

Second, in light of all these potential explanations for the disease, Kentucky law requires more than just the identification of something as a "possible" cause to satisfy the discovery rule and start limitations. While inadequate respiratory protection is clearly a potential reason a miner could develop a lung injury years after his exposure, more than just a diagnosis is required to take dust masks from the category of merely "possible" causes to one that is known to be probable. *See supra*, General Principle No. 4. Recognizing the difference between knowledge and mere suspicion, Kentucky courts have denied summary judgment on limitations based on the diagnosis of an illness merely because it is *possible* to link that diagnosis to the defendant. *See, e.g.*, *Johnson*, 24 F.App'x at 538 (denying summary judgment when plaintiff suffered a stroke shortly after taking a medication whose package insert disclosed past reports of strokes); *Van Landigham*, 2009 WL 2475258, at *3 (denying summary judgment when plaintiff, a retired asbestos tile worker, was diagnosed with pleural plaques even while acknowledging that asbestos is a common cause of pleural plaques); *Cutter*, 2021 WL 3754245, *1 at (denying summary judgment even though a physician told the plaintiff more than a year before filing suit that the defendant's pelvic mesh was a "possible" cause of the plaintiff's health problems).

Third, a categorial rule that starts limitations running simply based on the diagnosis of a latent disease ignores the requirement that a court consider the miner's perspective and experience. *See supra*, General Principle No. 5. "[A] court must give special consideration to the patient's perspective." *Cutter*, 2021 WL 3754245, at *5. That necessarily includes the plaintiff's level of education and training. Undoubtedly, the level of formal and informal education varies between coal miners, just as will the level of their formal and informal safety training. The assumption that a black lung diagnosis should immediately lead to knowledge of a defective mask worn to prevent it assumes that all miners know why they are required to wear masks and what harms masks are

14

designed to protect against and which ones they are not. Even if an inadequate dust mask were the <u>only</u> possible cause for developing lung disease (and it is not, as Defendants argue vehemently elsewhere), a court simply cannot assume that all Plaintiffs or any particular Plaintiff had the background knowledge to make the connection.

This is especially true for miners who never tasted or smelled dust when wearing the mask; thought the seal on their masks was good; and never saw dust on the inside of the mask and—as is likely—did not realize that CWP was caused by sub-micron particles that cannot be seen, tasted, or smelled. *C.f. Cutter*, 2021 WL 3754245, at *7 (holding that factual dispute existed over when the statute started to run under the discovery rule because, *inter alia*, the plaintiff "did not graduate from high school . . . she was not a doctor and had no special medical knowledge").

**9. Resolving the discovery rule in a particular case is almost always a question of fact for the jury.**

The principles articulated above explain why applying the discovery rule in a latent disease case is unavoidably and incredibly fact-specific, and why it is therefore almost always a question of fact to be answered by a jury. As the Sixth Circuit recognizes, "[i]t is well-established that the discovery rule ordinarily raises issues of fact as to whether a plaintiff should have known of a claim for relief, and whether a plaintiff exercised reasonable diligence, prohibiting resolution of the issue on either a motion to dismiss or motion for summary judgment." *Gilmore*, 185 F. App'x at 483 (internal quotations omitted).

Perhaps more importantly, Kentucky courts hold the same. *See Engle*, 328 S.W.3d at 189) ("When a plaintiff is put on notice of his injury is a question of fact for the jury."); *Van Landingham*, 2009 WL 2475258, at *3 ("[W]e note that it is not within the province of this court to determine whether Van Landingham knew or should have known of that he was harmed by asbestos in 1999. . . . such a determination is within the particular province of the jury."); *see also,*

15

*e.g.*, *Lipsteuer*, 37 S.W.3d at 737a (leaving to jury the question of whether the plaintiff "was not aware of the causal connection between his injuries and his workplace."); *Zapp v. CSX Transp., Inc.*, 300 S.W.3d 219, 224 (Ky. Ct. App. 2009) ("A reasonable juror may well have inferred from the evidence that Zapp did not know or should not have known of the work-related cause of his hand injury in 1999.").

### 10. *3M Co. v. Engle* is the best predictor of how the Kentucky Supreme Court would apply the discovery rule here.

In the only dust-mask case in which the Kentucky Supreme Court has addressed the discovery rule, it unequivocally noted that "[i]n latent disease cases such as this one, a plaintiff's cause of action accrues when he discovers, or in the exercise of reasonable diligence should have discovered, that he has been injured and that his injury may have been caused by the defendant. . . .When a plaintiff is put on notice of his injury is a question of fact for the jury." *Engle*, 328 S.W.3d at 189. While Defendants will attempt to minimize *Engle* as an unimportant ruling on a discovery matter, the context and procedural posture of the case show otherwise.

The *Engle* plaintiffs were coal miners who were diagnosed with coal workers' pneumoconiosis and filed suit against dust mask manufacturers, including current Defendants 3M, AO, and MSA. *Id.* at 186. The *Engle* defendants sought to take the deposition of the plaintiffs' attorney to establish when the plaintiffs first had knowledge of their claims against the manufacturers. *Id.* at 187. The issue made its way to the Kentucky Supreme Court, which ultimately granted the discovery and in doing so acknowledged that coal workers' pneumoconiosis is a latent disease, that the discovery rule applied, and that when the *Engle* plaintiffs were on notice of their claims was a question for the jury. *Id.* at 189.

Importantly, the discovery issue that was contested in *Engle* arose only <u>after</u> the defendants had first sought and been denied summary judgment on the statute of limitations. *Id.* at 186. More

16

importantly, in their briefing before the Kentucky Supreme Court, defendants pointed out that <u>all of the plaintiffs at issue in *Engle* had been diagnosed with coal workers' pneumoconiosis at least five years before filing suit</u> and repeated the same legal arguments they make here, contending that limitations begin to run when a coal miner is diagnosed with black lung.

If the Kentucky Supreme Court agreed, it would have granted their request for summary judgment in *Engle* and found the discovery issue regarding what they learned from their attorney and when moot. But it did not. Instead, the court impliedly rejected Defendants' position and noted that "[w]hen a plaintiff is put on notice of his injury is a question of fact for the jury." *Id.* at 189.

Federal courts "must predict how that court would rule, by looking to 'all available data.'" *Estep v. Combs*, 467 F. Supp. 3d 476, 498 (E.D. Ky. 2020) (citing *Whitlock v. FSL Mgmt., LLC*, 843 F.3d 1084, 1089 (6th Cir. 2016)). Even if *Engle* is read as merely addressing a discovery dispute, it nevertheless provides the best data point on how the Kentucky Supreme Court would apply the discovery rule to the cases before this Court.

              Respectfully Submitted,

              /s/ Joseph E. H. Atkinson
              Joseph E.H. "Eric" Atkinson (KBA #101266)
              Whiteford, Taylor & Preston, LLP
              Two James Center
              1021 East Cary Street, Suite 1700
              Richmond, Virginia 23219-4000
              Telephone: 804.977.3305
              Facsimile: 804.799.7866
              jeatkinson@whitefordlaw.com
              *Counsel for WT&P Plaintiffs*

              AND

              Masten Childers, III, Esq. (KBA # 94898)
              Sarah E. Cooley, Esq. (KBA # 99993)
              Madeleine R. Hamlin, Esq. (KBA #100019)
              Whiteford, Taylor & Preston, LLP

161 N. Eagle Creek Drive, Suite 210
Lexington, Kentucky 40509
Telephone: (859) 687-6699
Facsimile: (859) 263-3239
mchilders@whitefordlaw.com
scooley@whitefordlaw.com
mhamlin@whitefordlaw.com
*Counsel for WT&P Plaintiffs*

AND

Justin S. Peterson, Esq. (KBA #92633)
Kellie M. Collins, Esq. (KBA #92509)
Peterson Law Office, PLLC
2424 Harrodsburg Road, Suite 205
Lexington, Kentucky 40503
Telephone: (859) 469-6390
Facsimile: (859) 469-6391
justin@justinpetersonlaw.com
kellie@justinpetersonlaw.com
*Counsel for WT&P Plaintiffs*

AND

*/s/ Michael B. Martin*
Michael B. Martin
Texas Bar No.: 13094400
Kentucky Bar No.: 96907
699 S. Friendswood Drive, Suite 106
Friendswood, Texas 77546-4580
(713) 773-2035
(832) 559-0878 (fax)
mmartin@martinwaltonlaw.com
*Counsel for Martin Plaintiffs*

AND

Johnny Givens
Kentucky Bar No. 98938
GIVENS LAW FIRM, PLLC
240 Trace Colony Park Drive, Ste 100
Ridgeland, Mississippi 39157
Telephone:  (601) 300-2009
Facsimile:   (601) 651-3948
johnny@givens-law.com
*Counsel for Martin Plaintiffs*

**CERTIFICATE OF SERVICE**

  This is to certify that a true and accurate copy of the foregoing was electronically filed with the Clerk of Court using the ECF systems which will send notification of such filing to all counsel of record, this 30th day of October, 2025.

              /s/ Joseph E. H. Atkinson
              Joseph E. H. Atkinson, Esq. (KBA #101266)
              *Counsel for the WT&P Plaintiffs*